UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
DANIEL VALENTE DANTAS, DORIO FERMAN,       :
OPPORTUNITY FUND, OPPORTUNITY HDF          :
PARTICIPACÕES S.A., OPPORTUNITY ASSET      :
MANAGEMENT INC., OPPORTUNITY ASSET         :
MANAGEMENT LTDA., OPPORTUNITY ASSET        :
ADMINISTRADORA DE RECURSOS DE TERCEIROS    :
LTDA., OPPORTUNITY GESTORA DE RECURSOS     :
LTDA., OPPORTUNITY GESTÃO DE               :
INVESTIMENTOS E RECURSOS LTDA,             :
OPPORTUNITY DISTRIBUIDORA DE TÍTULOS E     :
VALORES MOBILIÁRIOS LTDA, OPPORTUNITY      :
LÓGICA GESTÃO DE RECURSOS LTDA,            :
OPPORTUNITY LOGICA RIO GESTORA DE          :       17 Civ. 01257 (JMF)
RECURSOS LTDA., OPPORTUNITY EQUITY         :
PARTNERS ADMINISTRADORA DE RECURSOS        :       **COMPLAINT**
LTDA., OPP I FUNDO DE INVESTIMENTO EM      :
AÇÕES NO EXTERIOR, LUXOR FUNDO DE          :
INVETIMENTO MULTIMERCARDO,                 :
INTERNATIONAL MARKET INVESTMENTS N.V.,     :
                                           :
                     Plaintiffs,           :
           v.                              :
                                           :
CITIBANK, N.A., CITIGROUP, INC., BANCO     :
CITIBANK S/A, INTERNATIONAL EQUITY         :
INVESTMENTS, INC., CITIGROUP VENTURE       :
CAPITAL INTERNATIONAL BRASIL, L.P., AND    :
CITIGROUP VENTURE CAPITAL INTERNATIONAL    :
BRAZIL, LLC,                               :
                                           :
                     Defendants.           :
-----------------------------------------------------------------------x

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................... 14

BACKGROUND FACTS ........................................................................................................ 14

A)   THE PARTIES ............................................................................................................. 14

B)   THE ORIGINS OF OPPORTUNITY'S RELATIONSHIP WITH CITIBANK AND THE
     ACQUISITION OF THE PORTFOLIO COMPANIES ....................................................... 17

C)   OPPORTUNITY PROTECTS THE PORTFOLIO COMPANIES' AND THE JOINT VENTURE'S
     INTERESTS AGAINST ATTACKS BY TELECOM ITALIA, TIW, THE MANAGERS OF THE
     PENSION FUNDS, AND FACTIONS OF THE BRAZILIAN GOVERNMENT ..................... 18

D)   CITIBANK BETRAYS OPPORTUNITY ......................................................................... 24

E)   THE NEW YORK LITIGATION ................................................................................... 32

F)   CITIBANK WRONGFULLY ACTS TO INCREASE THE PRESSURE ON OPPORTUNITY ... 33

██   ██████████████████████████████████████████████████ ............... 36

H)   THE PT PARTY AND ITS ALLIES IN THE REGIME PERCEIVE THAT MR. DANTAS POSES
     AN EXISTENTIAL THREAT TO THEIR POWER ............................................................ 45

I)   CITIBANK AND THE PT REGIME COERCE MR. DANTAS, MR. FERMAN, AND
     OPPORTUNITY TO RELEASE CITIBANK OF LIABILITY FOR BILLIONS OF DOLLARS OF
     CLAIMS AS PART OF THE POLITICIZED SALE OF BRASIL TELECOM ....................... 48

J)   AFTER THE CITIBANK SETTLEMENT, MR. DANTAS, MR. FERMAN, AND OPPORTUNITY
     FACE CONTINUING AND MOUNTING COERCION AND ████████████████████
     ████ ████ ████ ██ ████████ ████████████ 68

K)   THE DURESS ABATES, ALLOWING MR.  DANTAS, MR. FERMAN, AND OPPORTUNITY TO
     PURSUE THE INSTANT CLAIMS ................................................................................. 86

FIRST CLAIM FOR RELIEF (DURESS – BRAZILIAN LAW) ..................................... 90

SECOND CLAIM FOR RELIEF (DURESS – NEW YORK LAW) ................................ 92

THIRD CLAIM FOR RELIEF (MALICIOUS PROSECUTION – NEW YORK LAW)  94

FOURTH CLAIM FOR RELIEF (CONSPIRACY TO ENGAGE IN MALICIOUS
PROSECUTION – NEW YORK LAW) ............................................................................ 98

JURY DEMAND ............................................................................................................ 99

PRAYER FOR RELIEF .............................................................................................. 100

Plaintiffs Daniel Dantas, Dorio Ferman, and Opportunity[1], as and for their Complaint against Defendants Citibank, N.A., Citigroup, Inc., Banco Citibank S.A., Citigroup Venture Capital International Brazil, L.P. (the "Offshore Fund"), International Equity Investments, Inc. ("IEII"), and Citigroup Venture Capital International Brazil, LLC ("CVC Brazil") (the Defendants, except for the Offshore Fund for the period prior to March 9, 2005, are collectively referred to from time to time herein as "Citibank") allege upon personal knowledge as to their own acts and as to events taking place in the presence of their officers, directors, agents, and representatives, and upon information and belief as to all other facts, as follows:

## Preliminary Statement

1.      Plaintiffs were harassed, coerced, fraudulently prosecuted, jailed, defamed, and nearly put out of business by high officials of the then-ruling PT party in Brazil, with the active participation and inducement of Defendant Citibank.  The extraordinary facts regarding the corruption and domination of the Brazilian state by the PT party and its coalition partners have recently become public in scandals that have rocked Brazilian society, with new investigations and prosecutions continuing to emerge almost daily.  It is now clear that Citibank exploited this corrupt environment to manufacture false criminal charges against Plaintiff Daniel Dantas and to enlist corrupt elements in the governing Brazilian regime to threaten Mr. Dantas's, Plaintiff Dorio Ferman's, and their colleagues' liberty, and put in peril Opportunity's businesses, if they did not accede to a politically motivated telecommunications merger, release claims against Citibank worth billions of

---

[1]  Unless specified otherwise, for purposes of this complaint, "Opportunity" shall refer to all plaintiffs in the Opportunity family of companies as well as the related entity Banco Opportunity and its affiliates.

dollars, and grant Citibank interests in certain investment proceeds worth tens of millions of dollars more.

2.      Pressured by an escalating series of illegal threats, Mr. Dantas, Mr. Ferman, and Opportunity had no choice but to provide Citibank what it demanded.  Until recently, Opportunity's business remained subject to ruinous attack and the liberty of Mr. Dantas, Mr. Ferman, and their colleagues remained at serious risk.  This ongoing pressure, as intended, ensured that Mr. Dantas, Mr. Ferman, and Opportunity remained unable to pursue the claims for redress that would bring to light the illegal conduct that had occurred.

3.      On September 1, 2016, the PT party in Brazil was expelled from power with the removal from office of former President Dilma Rousseff.  The systematic wrongdoing by the party and its allies has now been exposed as what a Minister of the Brazilian Supreme Court has called a "model of corrupt governance" that "deserves the clear name of kleptocracy."   Significant investigations, prosecutions, and plea bargains have further revealed how the party, under former Brazilian Presidents Lula and Dilma, pacified and coopted coalition partners through bribery and other inducements.  The resulting regime engaged in systematic wrongdoing that pervaded and dominated the Brazilian state.  The judiciary was a special target of the wrongdoing:  Brazilian judges who did not do the regime's bidding were harassed, allowing the Party and its allies to rely on the press to judge and summarily punish targeted individuals in what was recognized even contemporaneously as an emerging "Police State".  The PT and its partners also worked to nominate judges who would acquiesce to their political agenda.  Bribery also helped ensure that the regime would get the results it desired from the Brazilian courts, and Brazilian lawyers were known to charge clients inflated bills in order to disguise the funding for the bribes.

4.     In December 2016, the shockwaves of these investigations reached newfound levels when former President Lula was himself indicted on charges that placed him at the center of the corruption.  The December 2016 indictment was Lula's fifth.  In bringing these new charges, Prosecutors said that Lula oversaw a scheme in which Latin America's biggest construction firm, Odebrecht, paid tens of millions of dollars to win contracts with the Brazilian state oil company, Petrobras.  Prosecutors further charged that Lula had personally benefitted from these kickbacks, which were surreptitiously used to purchase and renovate real estate for him and his wife, while other funds were funneled to the PT Party and its allies.  Also in December 2016, Marcelo Odebrecht, nicknamed the "Prince of the Contractors," and 76 other executives and shareholders of the Odebrecht firm signed plea bargain agreements with prosecutors which, though under seal, are understood to provide a first-hand account of rampant wrongdoing in the political system by the PT Party and other political parties that joined its corrupt scheme.  These plea bargains were formally ratified by the President of the Brazilian Supreme Court on January 30, 2017.  In all, in connection with the historic efforts of prosecutors and judges in the so-called "Car Wash" operation, hundreds of individuals have been arrested and dozens of companies have been implicated. Prosecutors across the world, including in the United States and in Switzerland, have also begun their own investigations of this wrongdoing and obtained their own guilty pleas.

5.     Even as these unprecedented investigations have methodically begun to uncover and reveal systematic wrongdoing among the elite in the Brazilian political and business communities, prosecutors have made no such accusations—or accusations of any kind—against Mr. Dantas or his colleagues at Opportunity.  To the contrary, prior fraudulent prosecutions of Mr. Dantas and Mr. Ferman have recently been finally dismissed█

███████████████████████████████████████████ These

developments at last allow Mr. Dantas, Mr. Ferman, and Opportunity to bring this action

and hold Defendants liable for the tremendous harm they have caused, though not without

some continuing trepidation.

6.     The parties' relationship began in the late 1990s.  At that time, Daniel

Dantas, a Brazilian national, formed several investment vehicles to take advantage of

economic opportunities in the Brazilian economy, including a joint venture designed to

acquire control positions in Brazilian companies, especially in the infrastructure sector.

Certain Brazilian pension funds of public employees with whom Opportunity already had a

relationship (the "Pension Funds") and Citibank joined this joint venture in which certain

Opportunity entities (and thus certain Opportunity investors) also participated.  Mr. Ferman

was a close collaborator with Mr. Dantas.

7.     The organizing principle of the joint venture was simple: to ensure that all

participants shared equitably in any gains from their investments and that none could

unilaterally appropriate a disproportionate share of any control premium or otherwise cut the

others out of the joint venture's investment positions.

8.     The parties to this joint venture agreed that an Opportunity entity would be

the general partner of the "Offshore Fund" through which Citibank invested and that another

Opportunity entity would manage the "Onshore Fund" through which the Pension Funds

invested.  Citibank, which had earlier invested together with Opportunity, admired

Mr. Dantas's track record, respected his reputation, and was eager to have him take the lead

in managing the joint investments in Brazil.  For many years after its relationship with

Mr. Dantas began, Citibank repeatedly affirmed that Mr. Dantas was doing an admirable job

of managing and protecting its interests, even as Opportunity had to fend off a variety of hostile efforts to cause damage to it, the joint venture, and some of the companies in which the joint venture had invested ("Portfolio Companies"), including Brasil Telecom, the largest of these side-by-side investments.

9.      Beginning in the late 1990s.  Telecom Italia and TIW (an unrelated Canadian company), which were strategic partners in certain of the joint venture's investments, sought to further their parochial commercial interests and to exploit for their own benefit the Portfolio Companies in which they invested.  To achieve that goal, Citibank and Opportunity's control positions in certain Portfolio Companies came under attack.  Both companies took advantage of the then-existing political environment in Brazil and employed an array of illegal means against Opportunity and the joint venture's and the Portfolio Companies' interests.

10.      With the election of President Lula at the end of 2002, the attempts by Telecom Italia to dominate significant portions of the Brazilian telecommunication market such as mobile and long distance service took on a more ominous political significance.  As has since become public, President Lula and the PT Party led a regime captured by partisan interests, driven and sustained by the corrupt exchange of government favors for support from other political parties and the private sector, and administered at all levels with stunning disregard for the rule of law.  As a few courageous Brazilian prosecutors and judges have now concluded, a crucial element in the maintenance of this regime was the use of state power by the PT Party and those it coopted to reward financial supporters with overpriced contracts and valuable corporate assets, with those supporters reciprocating by

making large contributions or by secretly and illegally channeling funds to their benefactors—funds that were then used to perpetuate the regime's hold on power.

11.     Brasil Telecom was an important prize.  The PT Party and its allies were eager to exploit Brasil Telecom for their political and private purposes.  But Mr. Dantas was an obstacle.  He resisted joining this corrupt scheme and sought to protect Citibank's and the joint venture's competitive position in Brasil Telecom and related mobile telephony services.  Senior members of the government responded by "going to war" against Mr. Dantas, Mr. Ferman, and Opportunity with the goal of removing them as an impediment to their own corrupt ambitions.

12.     Citibank was aware of the government's ambitions, its willingness to abuse the law to achieve them, and the damages Mr. Dantas, Mr. Ferman, and Opportunity had and would suffer in defending the joint venture's interests.  Until the fall of 2004, Citibank and Opportunity were in agreement that these assaults must be resisted and that Citibank would assist Opportunity in being made whole for the harm that Opportunity would thereby suffer.  But Citibank's posture would soon change.

13.     At the time, Citibank was embroiled in multiple global controversies that were damaging to its reputation.  It was eager to avoid becoming entangled in the massive public scandal that was being illegally manufactured against Mr. Dantas and Opportunity by Telecom Italia and corrupt authorities as part of the struggle over Brasil Telecom.  Citibank also wanted to appease the PT Party, the Pension Funds, and Telecom Italia for commercial gain, including to reverse or prevent being blacklisted by the significant sources of business they either influenced or controlled.  In late 2004, Citibank thus secretly agreed to betray Mr. Dantas and Opportunity.  Shortly after, in March 2005, Citibank removed the

Opportunity entity that acted as general partner of the Offshore Fund (Opportunity Equity Partners, Ltd.) under the false pretext of misconduct and substantial litigation ensued.

14.     Although it was not evident at the time, subsequent disclosures have made clear that Citibank thereafter became a full-fledged and central player in the corrupt scheme to ruin Mr. Dantas and his business.  In particular, recent revelations show that while Mr. Dantas, Mr. Ferman, Opportunity, and Citibank were locked in litigation in New York,

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ The public dissemination of these false allegations inflicted economic injury and reputational damage on Mr. Dantas, Mr. Ferman, and Opportunity and set in motion years of illegal persecution, which included the wrongful arrest of Mr. Dantas, Mr. Ferman, and others followed by years of groundless prosecutions in the Brazilian courts.

15.     The congressional committee in question was a response to the so-called Mensalão (or "big monthly payments") scandal, the first of several major scandals to rock and finally topple the system of corruption at the heart of Brazilian politics. ██████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████



Instead, with no factual or legal basis, the report accused Mr. Dantas of wrongdoing and recommended that he be indicted—as, without basis, he later was. The fraudulent inclusion of Mr. Dantas in the Mensalão report vilified him in the public eye, laid the groundwork for further, and even more serious, fraudulent attacks that would follow, and later resulted ████████████████████████████████████.

16. ████████████████████████████████ in federal court litigation in New York to argue that Mr. Dantas and Opportunity were unfit to control Brasil Telecom.

17. ████████████████████████████████████████

The intended result and the actual effect was to turn public opinion and the judiciary against Mr. Dantas, Mr. Ferman, and Opportunity, to inflict massive economic injury through lost business, and to create an environment in which the illegal persecution, arrest, and prosecution of Mr. Dantas and others at Opportunity became viable.

18. By late 2007, the PT regime was determined to push through the sale of Brasil Telecom to Telemar, another Brazilian telecommunications company that was owned by one of the PT regime's main benefactors, the Andrade Gutierrez firm. The government had previously tried to deliver Brasil Telecom to Telemar in 2005, but these efforts ran aground because of political turmoil relating to (i) the disclosure that Telemar had paid

millions of dollars to acquire a company owned by President Lula's son, and (ii) the Mensalão scandal.

19.     Two years later, the PT regime was ready to move ahead again.  This meant that the ongoing battle over Brasil Telecom had to be resolved.  Mr. Dantas and Opportunity were the principle obstacles to doing so.  The government, which claimed the creation of a Brazilian "Supertele" as an essential presidential objective, wanted them out of the way. Mr. Dantas, who was already defending himself against a host of baseless and fraudulent criminal charges and was under the threat of an illegal arrest, understood from messengers of the PT Party, among others, that he, his colleagues, and Opportunity would suffer continuing and even greater harm if they refused to settle their ongoing litigations and relinquish their rights to pursue certain other claims.

20.     It was made clear to Mr. Dantas that his and his colleague's liberty was at risk, since authorities were prepared to use trumped up charges to send them to prisons that held violent criminals and were notoriously unsafe.  Mr. Dantas, Mr. Ferman, and Opportunity understood that they had no choice but to relinquish their claim to control of Brasil Telecom as the steep price for ending the hostilities they faced.  They recognized there was no basis to expect an impartial adjudication of whatever charges were manufactured against them.  Moreover, regardless of what happened in any specific case, Mr. Dantas and Mr. Ferman had seen that the regime and its allies were prepared to generate new false accusations as needed to keep the pressure on.

21.     Opportunity nonetheless insisted on retaining its ability to pursue claims for damages against both the Pension Funds and Citibank for the wrongs Mr. Dantas, Mr. Ferman, and Opportunity had suffered in the course of defending Citibank's, the joint

venture's, and the Portfolio Companies' interests—including false criminal accusations, malicious and deceitful public ridicule, and attacks on their personal and business reputations.

22.     Mr. Dantas was told, however, that he must give up his and Opportunity's claims against the Pension Funds, which the PT Party regarded as a branch of the state apparatus under its control.  Mr. Dantas was warned that the government would not take any risk of leaving its allied Pension Funds at the mercy of the courts.

23.     Forced to give up their claims against the Pension Funds, Mr. Dantas, Mr. Ferman, and Opportunity intended to pursue their rights to full compensation from Citibank for the harm caused by the corruption and systematic wrongful conduct that had been directed at them.

24.     Citibank recognized Opportunity's intentions and took aggressive action to enlist the power of the state to force Mr. Dantas, Mr. Ferman, and Opportunity to provide releases that would immunize Citibank of any liability for claims worth billions of dollars. The message to Mr. Dantas was clear:  if he, Mr. Ferman, and Opportunity did not acquiesce in providing what Citibank had demanded, Mr. Dantas and his colleagues at Opportunity would be subjected to intensified persecution, false prosecutions in violation of their constitutional rights, financial ruin, and the loss of personal liberty.  Such warnings, of which Citibank was aware and which it induced and promoted, came mainly through PT Party intermediaries and allies, government sponsored media outlets, and Citibank's lead negotiator with Opportunity.

25.     Mr. Dantas had already been subjected to false and fraudulent criminal, civil, and administrative charges ████████████████████████ related and oppressive

publicity campaigns, and threats to his life and his and his family's safety.  He could readily interpret the signs that were being conveyed to him, and recognized that the latest threats against him were real; the full power of the Brazilian state was prepared to act against him and his colleagues and illegally deprive them of their liberty; and he thus had no choice but to concede.  In April 2008, under duress, Mr. Dantas, Mr. Ferman, and Opportunity were forced to submit to a settlement of claims against Citibank and provide a release that covered both Opportunity's counterclaims against Citibank in litigation pending in New York and other significant claims that Citibank knew Opportunity was preparing to file in Brazil.  They were also forced to grant Citibank valuable rights to certain investment proceeds.

26.     However, the promised end of the hostilities did not come.  Rather, Mr. Dantas, Mr. Ferman, and Opportunity continued to face growing wrongful pressure that ensured they would not be able to assert their rights to recover for the harm they suffered when they were forced to acquiesce to this duress.

27.     In July 2008, Mr. Dantas, Mr. Ferman, and several of their colleagues were illegally arrested and imprisoned 

.  Despite knowing that

, Citibank failed to prevent those allegations from causing continued significant harm.  In fact, Citibank's agents worked to

28.     The continuation of the coercive campaign of persecution post-settlement prevented Mr. Dantas, Mr. Ferman, and Opportunity, under ongoing threats, from

challenging the April 2008 Brasil Telecom sale and settlement transactions in lawsuits that would reveal the illicit conduct of Citibank and its co-conspirators.  Citibank benefitted from the continuing duress that compelled Mr. Dantas and Mr. Ferman to keep silent about the circumstances in which they and Opportunity were forced, against their will, to sign claims away and involuntary provide valuable consideration.

29.    At last, more than eight years after being forced to forego claims against Citibank and grant Citibank valuable investment proceeds, Mr. Dantas, Mr. Ferman, and Opportunity are finally able, though still not without trepidation of potential reprisals, to seek compensation for the wrongs that Citibank committed.  Three things make this possible.

30.    First, on August 31, 2016, the Brazilian Senate voted to remove Dilma Rousseff as President of Brazil following impeachment proceedings.  On October 20, 2016, the Brazilian Supreme Court rejected Ms. Rousseff's request for an injunction to stay the impeachment.  Ms. Rousseff, while she was Chief of Staff to then President Lula, oversaw the Supertele transaction in which coercion was used to force Opportunity to agree to the sale of Brasil Telecom and give in to the demands of Citibank and the Pension Funds.  Her removal from office and the PT Party's corresponding loss of power significantly reduces the likelihood that Mr. Dantas, Mr. Ferman, and Opportunity will face reprisals for bringing a lawsuit that personally implicates not only former Presidents Rousseff and Lula but those in the PT Party most closely connected to them (several of whom are now themselves under arrest or indictment or have entered plea bargains).  While elements of the PT regime had shown no compunction about manufacturing false accusations and prosecuting false and fraudulent claims to protect the regime's power and deflect attention from its own

corruption, this threat has finally abated as the regime has lost control of the Brazilian state apparatus.

31.     Second, the escalating series of scandals that resulted in the removal of President Rousseff from office and in the unprecedented prosecution and arrest of other high-ranking officials of the PT Party and its coalition partners, including former President Lula, his Chief of Staff, and former finance ministers, has brought to public light the corruption and domination of the state apparatus practiced by the PT Party since President Lula's election in 2002.  With new revelations coming almost daily, the culture of lawlessness that forms the context of this lawsuit is no longer secret and the claims in this lawsuit no longer pose as significant a threat to a corrupt way of governing and to a system already publicly discredited by revelations of corruption and misuse of state power on a massive scale.  Indeed, by December 2016, with a new round of corruption charges against President Lula and the January 30, 2017 announcement of the ratification of the Marcelo Odebrecht and related plea bargains, the cat is out of the bag both in Brazil and with international law enforcement authorities.  Thus, Mr. Dantas, Mr. Ferman, and Opportunity now face substantially less risk that filing these claims will result in a new round of reprisals.

32.     Third, Mr. Dantas, and Mr. Ferman have been acquitted, and claims have been dismissed, in the high profile criminal cases that were brought against them. ▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Only in the past

few months have these false criminal charges against Mr. Dantas and Mr. Ferman been dispositively resolved.

## Jurisdiction and Venue

33.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 632 because it is civil lawsuit that involves a U.S. chartered bank that arises out of transactions involving the international and foreign financial operations of Citibank.

34.     This Court has personal jurisdiction over each of the Defendants pursuant to NY CPLR § 302(a).  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## Background Facts

### A)     The Parties

35.     Plaintiff Daniel Valente Dantas, a citizen of Brazil, is the founder of the investment business known as Opportunity, which he formed in 1992.

36.     Plaintiff Dorio Ferman, a citizen of Brazil, is shareholder of certain entities operating under Opportunity's brand and is the founder, controlling shareholder, and chief executive officer of Opportunity HDF Participações S.A., formerly known as Banco Opportunity.

37.     Plaintiff, Opportunity Fund, is a company incorporated under the laws of the Cayman Islands. Opportunity Fund was one of the participants in the joint venture formed by Mr. Dantas that relates to this litigation.

38.     Plaintiff Opportunity HDF Participações S.A. (formerly Banco Opportunity S.A.), is a company incorporated under the laws of Brazil.  Banco Opportunity is a Brazilian bank that from 1997 to October 2003 was the administrator of the Onshore Fund.

14

39.     Plaintiff Opportunity Asset Management Inc., is a company incorporated under the laws of the Cayman Islands.  Opportunity Asset Management Inc. was formerly the investment advisor of the Opportunity Fund.

40.     Plaintiff Opportunity Asset Management Ltda., is a company incorporated under the laws of Brazil, which manages its own and third party investments.

41.     Plaintiff Opportunity Asset Administradora de Recursos de Terceiros Ltda., is a company incorporated under the laws of Brazil, which manages third party investments.

42.     Plaintiff Opportunity Gestora de Recursos Ltda., a company incorporated under the laws of Brazil, which manages third party investments.

43.     Opportunity Gestão de Investimentos e Recursos Ltda (formerly Opportunity Gestão Internacional De Recursos Ltda.) is a company incorporated under the law of Brazil, which manages third party investments.

44.     Opportunity Distribuidora de Títulos e Valores Mobiliários Ltda is a company incorporated under the law of Brazil, which manages third party investments.

45.     Plaintiff Opportunity Logica Rio Consultoria e Participações Ltda. (formerly Opportunity Logica Rio Gestora de Recursos Ltda.), is a company incorporated under the laws of Brazil.  Opportunity Logica Rio Consultoria e Participações Ltda. manages third party investments.

46.     Plaintiff Opportunity Equity Partners Administradora de Recursos Ltda., is a company incorporated under the laws of Brazil.  From 1997 to October 2003, Opportunity Equity Partners Administradora de Recursos Ltda. was the portfolio manager of the Onshore Fund.

47.     Plaintiff Opp I Fundo de Investimento em Ações Investimento no Exterior, is an investment fund incorporated under the laws of Brazil.  The portfolio manager of this fund is Opportunity Asset Administradora de Recursos de Terceiros Ltda..  This fund was an investor in the Portfolio Companies discussed below.

48.     Plaintiff Luxor Fundo de Investimento Multimercado, is an investment fund incorporated under the laws of Brazil.  This fund was an investor in the Portfolio Companies discussed below.

49.     Plaintiff International Market Investments N.V., is a company incorporated under the laws of the Netherlands.

50.     Defendant Citibank, N.A. is a national banking association with its principal place of business in New York, New York.  It is one of the world's largest banks. Defendants Citigroup, IEII, the CVC Fund, and CVC Brazil are all affiliates of Citibank.

51.     Defendant Citigroup Inc. is a Delaware corporation with its principal place of business in New York, New York.

52.     Defendant International Equity Investments, Inc. ("IEII") is a Delaware corporation.  It is a wholly-owned subsidiary of Citibank, N.A.

53.     Defendant Citigroup Venture Capital International Brazil, L.P. (the "Offshore Fund" or "CVC Fund") is a private equity fund registered as a Cayman Islands Exempted Limited Partnership.  IEII is a limited partner of the Offshore Fund that was one of the joint venture's participants.

54.     Defendant Citigroup Venture Capital International Brazil, LLC ("CVC Brazil") is a Delaware limited liability company.  It is a subsidiary of IEII with its principal

place of business at 399 Park Avenue, New York, New York.  CVC Brazil became the

general partner of the CVC Fund in March 2005.

55.     Defendant Banco Citibank S.A. ("Citibank Brasil") is a Brazilian corporation

with its principal place of business in São Paulo, Brazil.  Citibank Brasil is a subsidiary of

Citibank and provides banking services in Brazil.

**B)     The Origins of Opportunity's Relationship with Citibank and the
Acquisition of the Portfolio Companies**

56.     In the 1990s, Mr. Dantas organized investments in certain Brazilian

companies as part of his private equity investment business.

57.     In 1997, several Pension Funds with whom Opportunity already had a

relationship joined with Opportunity to invest in the Portfolio Companies.  Citibank, which

wished to convert much of its Brazilian government debt instruments into equity

investments, also chose to invest with Mr. Dantas and Opportunity.  For various reasons,

including tax and regulatory constraints, Citibank, the Pension Funds, and Opportunity

invested through three separate fund groups that together formed a single joint venture:

(i) the "Offshore Fund" through which Citibank invested; (ii) the "Onshore Fund" through

which the Pension Funds and others invested; and (iii) a group of funds, the "Opportunity

Funds," through which persons and entities affiliated with Mr. Dantas, Mr. Ferman, and

other independent investors, invested.  Collectively, the joint venture of the Offshore Fund,

the Onshore Fund, and the Opportunity Funds is referred to herein as the "Funds."

58.     Over time, the Funds invested over one billion dollars in capital, and

Opportunity set out to pursue investment opportunities on their behalf.

59.     In 1998, Opportunity organized a consortium in which the Funds and others

invested along with Telecom Italia International N.V.  ("Telecom Italia"), the Italian

telecommunications company, which acquired control of Brasil Telecom, a multi-billion dollar privatized telecommunications company.  Opportunity also organized a second consortium, this time involving TIW (a Canadian group), which participated in the privatization of certain mobile telephony assets in Brazil.  In both of these consortiums, the Pension Funds had certain direct investments and the Funds, acting together through Opportunity, exercised control of the acquired companies and put in place experienced professionals to run the Portfolio Companies and transform their culture from state-controlled entities to companies operating consistent with the highest international standards.

**C)**     **Opportunity Protects the Portfolio Companies' and the Joint Venture's Interests Against Attacks by Telecom Italia, TIW, the Managers of the Pension Funds, and Factions of the Brazilian Government.**

60.     Starting in 1999, each of Telecom Italia and TIW sought to exploit for their own benefit the Portfolio Companies in which they had invested alongside the joint venture. In defending the Portfolio Companies' and the joint venture's interests, Opportunity expended considerable resources and suffered deliberate and unjustified attacks on its reputation.  The purpose of these attacks was to try to pressure Opportunity to stop defending the Portfolio Companies' and the joint venture's interests against these hostile efforts to undermine the Portfolio Companies' business.  To maximize the pressure, these attacks were calculated to cause harm to Mr. Dantas's, Mr. Ferman's, and Opportunity's substantial business interests separate and apart from their role in connection with the joint venture and the Portfolio Companies.

61.     These battles were not ordinary commercial disputes.  Opportunity's opponents employed all manner of illicit tactics, including:  bribery and other corruption to influence public officials, police officers, and judges; illegal interception of telephone and

electronic communications; the manufacturing of false evidence; and engaging in a smear campaign that relied on a paid-for network of "journalists" who published a drum beat of press articles, blog posts, and other media content designed to damage Opportunity's franchise and Mr. Dantas's and Mr. Ferman's reputation.  As agents of TIW and Telecom Italia expressly discussed: the goal was "hitting" Mr. Dantas "below the belt."

62.     Telecom Italia's and TIW's tactics included systematic efforts to gain support for their initiatives against Mr. Dantas and Opportunity by corrupting individuals and factions in the Brazilian government, acting individually and through the political appointees that managed the Pension Funds.

63.     The Pension Funds of state-controlled Brazilian companies such as Banco do Brasil and Petrobrás are the largest institutional investors in Brazil.  That arrangement affords their managers significant power. These managers over time have been political appointees who have used their power for political ends—such as funding illegal political campaigns and other politically motivated initiatives—regardless of the interests of the pensioners that are the funds' true beneficiaries.

64.     Taking advantage of the political environment in Brazil, Telecom Italia and TIW garnered support from the managers of the Pension Funds and government authorities to back their efforts to dominate the Portfolio Companies for their own gain and gain advantage in the Brazilian telecommunication market.  To achieve their goal, Telecom Italia, TIW, the managers of the Pension Funds, and their government allies launched a systematic campaign to discredit Mr. Dantas, Mr. Ferman, and Opportunity in the public eye.  In 2000, for example, a senior manager of the Pension Fund of Banco do Brasil, Previ, was quoted in

the Brazilian press stating that Opportunity "will be treated with borduna [an Indian war club or mace]."

65.    In 2002, Luiz Inácio Lula da Silva ("Lula") was elected president of Brazil. He was a founding member of the *Partido dos Trabalhadores* or "PT Party" and assumed power on January 1, 2003.  While the politically motivated attacks instigated by Telecom Italia and TIW predated the assumption of power by the PT Party, these attacks escalated to an altogether different level after President Lula was elected and PT-appointed supporters took on senior roles at the Pension Funds and began to use this power to serve the interests of the party and its coalition partners.

66.    Shortly after the 2002 election, the treasurer of the PT Party, Delubio Soares, accompanied by an advertising executive, Marcos Valerio, told Opportunity that the party had a deficit of $50 million and asked if Opportunity could solve the problem with what would have been an illegal contribution.  In what would become a recurring pattern, the representatives of the PT suggested that such a contribution was necessary if Opportunity wanted to level the playing field and end the hostilities faced by Opportunity, the joint venture, and the Portfolio Companies that were resulting from Telecom Italia's illicit influence within the government. Opportunity was not willing to engage in this illegality, although it was concerned about what the government might do if the request was refused.

67.    In an email to Mary Lynn Putney, who was then the Citibank executive overseeing its investment in the Offshore Fund, Mr. Dantas explained the context of the PT Party's demand for funds.  The Party, he explained, was acting in furtherance of a "political agenda" that "promises to reduce social inequality on an unprecedented scale."  At the same time, the leaders of this political movement, who did not come from and were not

traditionally allied with the aristocratic classes, did not have the "money needed and are desperately looking for means to cover their debts" from the 2002 presidential campaign. The politicians were also "hungry for money" to "give aid to their constituency", who, in return for votes, had come to expect assistance in the form of "medicine, material to build the house, work, employment, money, etc." This kind of vote selling, like the fundraising request aimed at Opportunity, was illegal. But the PT Party—many of whose members had suffered persecution in fighting for democracy against the Brazilian military dictatorship— viewed themselves as heroes in pursuit of social justice. As heroes, they "perceive[d] themselves with the right not to comply with the rules within the system which gave cause for the need for heroism." Mr. Dantas closed by noting to Ms. Putney that these considerations both explained the Party's behavior and highlighted the risk that Opportunity and Citibank faced in resisting. The PT Party was driven by the "perception of legitimacy" for their cause, and Opportunity and Citibank could "not underestimate the pressure that will fall over us" if they did not give the Party what it wanted.

68.    Mr. Dantas went to New York to discuss these issues further with Citibank and ask for its support in denying the request. Opportunity and Citibank agreed that they would reject this request for a contribution and Opportunity, acting on behalf of itself and Citibank, did not pay the demanded funds.

69.    Although it was not clear at the time, a subsequent series of scandals and criminal investigations that have reconfigured Brazilian politics has revealed that the efforts by the PT Party and the managers of the Pension Fund's to favor Telecom Italia and TIW against the joint venture's rights reflected a broader system of corruption of the Brazilian state by corporate interests that acted quickly to exploit the PT Party's rise to power and take

advantage of the Party's willingness, driven by its belief in the nobility of its cause, to maintain itself and its coalition partners in power indefinitely even through illegal kickbacks, intimidation, and bribes.

70.     As has now been publicly revealed, the PT Party utilized all elements of the power of the state to further its interests.  The Party's tactics included congressional inquiries, civil and criminal proceedings, and enforcement actions, in each case commenced without regard to merit.  Many judges, prosecutors, police agents, and regulators were beholden to the PT agenda and susceptible to pressure and even bribes offered by Opportunity's adversaries and their agents to further the extortive and retaliatory goals of the regime.  The breadth of the illicit practices was extensive, and other political parties within the state became complicit by supporting the regime in return for a share of the spoils.

71.     Factions of the Brazilian press were also directly or indirectly controlled by the government to a degree unimaginable in the United States, including through the Government's power to control the distribution of enormous advertising revenues to elements of the press.  The resulting propaganda machine dutifully manufactured pseudo-scandals based on partisan claims of wrongdoing and amplified the party's attacks against targeted enemies, including judges and prosecutors who dared to investigate illegal conduct that implicated the corrupt way of governing led by the PT Party and its allies.  Among the enemies who would be targeted in this way were Mr. Dantas and Opportunity.

72.     In May 2003, Mr. Dantas was summoned to meet with the then-recently appointed Chief of Staff to President Lula, José Dirceu, who years later was convicted of corruption and sentenced to years in prison.  Minister Dirceu told Mr. Dantas that the government believed it was important that the struggles over Brasil Telecom be resolved.

22

He further said that the managers of the Pension Funds were complaining that they were not the ones giving the orders at Brasil Telecom.  Minister Dirceu also told Mr. Dantas that Cassio Casseb Lima, the newly-appointed President of Banco do Brasil, had been chosen by the government to resolve the matter.  As Mr. Dantas knew, Mr. Casseb was Telecom Italia's chosen appointee to the boards of companies in the Brasil Telecom control chain.

73.     On May 9, 2003, Mr. Dantas wrote to Mary Lynn Putney, described the situation, and asked for Citibank's help:

> "I cannot deny some frustration after facing simultaneously Telecom Italia, TIW, the pension funds, Telemar, the previous government, the press and all manner of corruption in the courts and other agencies.  I have been accused of everything, but found guilty of nothing.  I have been exposed to the biggest defamation on record in Brazil.  I have undergone many threats, from tax audits to harassment of my family.  I have spared no effort in the performance of my duty to defend your interests.  None of our actions has been taken without Citibank's knowledge and agreement…
>
> "The pension funds as well as Citigroup have benefited from our management.  We have guaranteed the most valuable stakes to the investors who entrusted their assets to us.  The other parties in these arrangements came to realize that we did indeed have the better part of the pie.  They then tried to take it from us.  We resisted and consolidated our position…. We have a great deal of value in our business.  We can expect to remain unthreatened by aggression only if our safe is perceived to be either empty or invulnerable.  It is neither."

74.     By the end of August 2003, it became increasingly apparent to Mr. Dantas that the PT regime intended to deliver Brasil Telecom to Telecom Italia, which would pursue its own interests by sharing control of its mobile operations with Telemar, the Brasil Telecom competitor whose shareholders included the Andrade Gutierrez firm, a major political benefactor of the PT Party and others.



██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████ Mr. Casseb thereafter made similar threats directly to Opportunity.

75.     In October 2003, the Opportunity entity managing the Onshore Fund was indeed illegally removed.  When an agent of Telecom Italia heard about what happened, he recognised that this was just the beginning of the "extreme" lengths the government would go to place pressure on Opportunity, including by undermining the "solidarity" that Opportunity received from Citibank. He expressly noted to Mr. Dantas that the "law is no obstacle to those in power," just as subsequent events would emphatically prove.

**D)     Citibank Betrays Opportunity**

76.     Mr. Dantas kept Citibank fully aware of all that he knew regarding the intensity, impropriety, ferocity and means used to attack him and Opportunity, to attempt to dominate the Portfolio Companies, and to undermine their businesses.

77.     To protect its own franchise, Citibank relied on Opportunity to lead the defense against these attacks, knowing Opportunity's reputation would in turn be exposed and thus that Opportunity and Mr. Dantas personally would suffer significant damages. Over time, Opportunity invested substantial additional money of its own, and of its investors, to help protect the joint venture's and the Portfolio Companies' interests.  Such additional investment was not part of the joint venture's original objective.

78.     At the time, Citibank committed its best efforts to help Mr. Dantas and Opportunity to obtain indemnification for the damages they had suffered, and would continue to suffer, through a negotiated solution or, preferably, in international arbitration

████████████████████████████████

against tortfeasors like Telecom Italia or in other claims against those who benefited from

Opportunity's efforts defending the joint venture's and the Portfolio Companies' interests.

Both Opportunity and Citibank had clear indications that Opportunity's opponents engaged

in bribery and other improper means of securing favorable rulings in Brazilian courts.

Especially in these circumstances, Mr. Dantas and Opportunity would not have agreed to

incur the damages and make the additional investments required to protect Citibank's

investment interests by taking the lead in defending those interests without these assurances

from Citibank.  The damages Opportunity suffered and the investments it made defending

the joint venture's and the Portfolio Companies' positions increased Opportunity's amount

at risk to a level significantly beyond that of Citibank.

79.     Meanwhile, Telecom Italia, taking advantage of the corrupt Brazilian

political system and working with the representatives of the PT regime at the Pension Funds,

was intent on encouraging Citibank to betray Opportunity.

80.     In December, 2003, ███████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

81.     In 2004, a new management team replaced Mary Lynn Putney at Citibank. This new management team was led by Michael Carpenter, who was a longtime colleague of Citibank's then-CEO, Sanford Weill.  Messrs. Weill and Carpenter had worked together at Travelers Group, which merged with Citicorp in 1998.

82.     After the merger, Messrs. Weill and Carpenter brought to Citibank the aggressive business practices for which Travelers was known and, under Mr. Weill's leadership, a number of high profile Citibank scandals followed.  Mr. Carpenter ran Citibank's investment bank until 2002, when he was removed from that position in the wake of a scandal in which Citibank analysts were accused of providing favorable research reports to companies that hired Citibank's investment bank.  Mr. Carpenter was transferred to Citibank's alternative investments unit, where his duties included responsibility for Citibank's Offshore Fund investment in Brazil.

83.     Despite Citibank's ostensibly passive role as a limited partner in the Offshore Fund, Mr. Carpenter decided to have Citibank take a new, active role and engage directly with Brasil Telecom's management and with those involved in attacking the joint venture, such as Telecom Italia, the managers of the Pension Funds, the PT Party, and factions and individuals in the Brazilian government.  These interactions exposed Citibank to the kinds of attacks that previously had been directed at Mr. Dantas, Mr. Ferman, and Opportunity.  As referenced in an internal email among agents of Telecom Italia, the goal of these direct attacks was to "subvert" the local Citibank representative in Brazil to cause a "betrayal" of Mr. Dantas by Citibank executives like Mr. Carpenter in New York.  The same email also discussed that Telecom Italia sought to "bleed Mr. Dantas" and, once he was "weakened . . . you essentially call a truce to the 'war' but carve him up in the peace negotiations."

84. Citibank's partnership with Opportunity reached a turning point in connection with a police operation manufactured by Telecom Italia involving the private investigation firm Kroll. Brasil Telecom had hired Kroll at the suggestion of Citibank and its New York lawyers, to collect evidence of wrongdoing by Telecom Italia as part of Brasil Telecom's efforts to defend itself against Telecom Italia's attacks.

85. When Telecom Italia learned of the Kroll investigation, it stole an electronic copy of Kroll's work product and doctored it, including to make it appear that Mr. Dantas was in charge of an investigation by Kroll into wrongful conduct by the PT regime. Telecom Italia then provided the stolen and doctored Kroll report to Brazilian authorities, including the Minister of Justice and the police, claiming it had been sent to Telecom Italia anonymously; bribed the head of the Federal Police and the head of the Brazilian intelligence agency ABIN to pursue criminal charges against Mr. Dantas and Brasil Telecom's CEO; and coordinated a media campaign to further generate support for such criminal charges.[3]

86. As Telecom Italia intended, prompted by the stolen and doctored Kroll report, the PT government and its allies came to fear that Mr. Dantas could reveal the deep corruption within the Brazilian political system that, ten years later, has now been revealed in scandals that have rocked Brazilian politics and eliminated the PT Party's power. Representatives of the PT regime made use of the pretext given by Telecom Italia and targeted Mr. Dantas as a public enemy and took aggressive actions against him and

---

[3]  Contrary to what Telecom Italia represented to the Brazilian Government and to the Pension Funds, the decision to hire Kroll was not taken by Mr. Dantas, but by the management of Brasil Telecom, based on the advice of Citibank and its lawyers.

Opportunity, including to subject Mr. Dantas to groundless criminal proceedings known as "Operation Jackal".[4]

87.    The fraudulent accusations followed the template for how representatives of the PT regime would target enemies who threatened the party's hold on power:  fraudulent evidence would be used to justify an investigation; friendly police agents, prosecutors, and hand-picked judges would rely on the manufactured claims of wrongdoing to publicly disparage the target; and the media, including journalists aligned with the regime, would spread the attacks and build public sentiment against the target that would then be used to ostensibly justify the original criminal claims.

88.    Telecom Italia's wrongdoing in Brazil and elsewhere was subsequently investigated by Italian prosecutors who uncovered overwhelming evidence that, among other wrongdoing, Telecom Italia had illicitly orchestrated Operation Jackal.  Mr. Dantas, after being summoned, provided testimony as a victim in these investigations.

89.    Telecom Italia's fraudulent conduct in manufacturing Operation Jackal has

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

90.    At the time, however, the extent of the corrupt conduct by Telecom Italia, and the PT regime and its allies was not known.  Nor was there awareness of the extent of

_____

    [4]  As discussed further below, the Brazilian courts ultimately recognized the illegality of Operation Jackal and dismissed (or affirmed the acquittal) all charges against Mr. Dantas.  This took many years, however, and came far too late to avoid or offset the reputational and other harm that had already been caused.

the PT regime's domination of the Brazilian state.  In this environment, the false accusations resulted in a massive scandal aimed at Opportunity and Mr. Dantas. ██████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████ But media outlets, fed by Telecom Italia, continued to implicate Citibank in the supposed wrongdoing at issue in Operation Jackal.

91.    Citibank's senior executive in Brazil, Gustavo Marin, ████████████ ███████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████

92.    ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████████



93. ███████████████████████████████████

████████████████████████████████████████ on November 1, 2004, just days after Operation Jackal was officially made public, Citibank secretly switched sides and joined forces with Telecom Italia and its allies in the PT regime after ████████████████████████████████ ████████████████████████████

94. ███████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ Angra's partners included individuals with close connections to Citibank and Andrade Gutierrez.

95. These negotiations resulted in an agreement, finalized in March 2005, between Citibank and the Pension Funds, ████████████████████████ ██████████████████ who has since been arrested and accused of bribery.

96. Pursuant to this March 2005 agreement, Citibank committed ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ In switching sides, Citibank betrayed its commitment to assist Opportunity in collecting damages it had suffered in defense of the joint venture's interests.

97.     In its deal with the Pension Funds, Citibank committed to taking all steps necessary to remove Opportunity Equity Partners Ltd. from its position as general partner of the Offshore Fund, including initiating legal action to accomplish that end.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

98.     Citibank was amply rewarded for furthering the political interests of the PT Party and its coalition partners, betraying Opportunity, and agreeing to assist the Pension Funds' litigious attacks against Opportunity in Brazil.  Citibank received a valuable right to "put" its interests in certain of the Portfolio Companies to the Pension Funds at a fixed, deep-in-the-money price that guaranteed Citibank a significant return on its investment regardless of how the PT regime's politicized agenda hurt the Portfolio Companies' actual performance (the "Citibank Put").  Citibank also was able to expand considerably its commercial presence in Brazil and to rehabilitate its commercial relationships with Telecom Italia and its affiliated companies.  Citibank's investment banking arm also became significant advisors on major national operations of interest to the Brazilian government.

99.     This work ultimately led to new scandals, such as Citibank's role in the purchase of the Pasadena refinery by the Brazilian state oil company Petrobrás, which has become a flashpoint in Brazil.  There is evidence that Petrobrás overpaid hundreds of millions of dollars for a dilapidated refinery and then funneled the excess money into a massive kickback scheme benefitting the PT Party and its allies which has led to several

arrests and prosecutions.  Notably, Citibank acted as the investment bank that provided

Petrobrás (whose Board chair at the time was Dilma Rousseff) with an opinion attesting that

the massively inflated Pasadena purchase price was fair.

      **E)**      **The New York Litigation**

100.     In March 2005, Citibank, consistent with its commitment to the PT

regime and the party's representatives in the management of the Pension Funds, brought

suit in New York (the "New York Litigation") to pursue claims against Mr. Dantas and

Opportunity for alleged breaches of fiduciary duties and to oust them from control of the

Offshore Fund, thus joining in the parallel efforts of the PT managers of the Pension

Funds to engulf Mr. Dantas and Opportunity in a multitude of lawsuits.

101.     Citibank thereafter sought to use this litigation to gain leverage over

Mr. Dantas, Mr. Ferman, and Opportunity.  Based on an incomplete record and

assumptions of legitimacy of Brazilian authorities that have now been revealed to be

unwarranted, the District Court issued a series of broad preliminary injunctions, taking

the position that Citibank, through the Offshore Fund, had the effective right to control

Brasil Telecom itself and to appoint Brasil Telecom management of its choosing.  In an

August 30, 2007, summary order, the Court of Appeals for the Second Circuit rejected

Mr. Dantas and Opportunity's appeal of aspects of these preliminary injunctions.

102.     Opportunity responded in the New York Litigation by filing

counterclaims alleging, *inter alia*, that Citibank had breached the fiduciary duties that it

owed Opportunity by acting to subvert investment decisions that were in the best

economic interests of their joint venture and the Portfolio Companies, because Citibank

had agreed to support the political motivations of the PT representatives in the

management of the Pension Funds knowing that its own economic interests in the

Portfolio Companies were insulated from harm because of the Citibank Put.  In its counterclaims, Opportunity also set forth how Citibank's decision to terminate Opportunity Equity Partners Ltd. as general partner of the Offshore Fund was pretextual, and the District Court in the New York Litigation had been misled about Citibank's reasons for taking such action.

103.    By order dated November 20, 2007, the District Court in the New York Litigation set a deadline of May 1, 2008, for the close of fact discovery, and a deadline of July 29, 2008 for a joint pretrial order, any motions for summary judgment, and any requests to charge.

104.    Ultimately, the issues raised by the parties in the New York Litigation were never tried because of the April 2008 Citibank Settlement discussed below.

**F)      Citibank Wrongfully Acts to Increase the Pressure on Opportunity**

105.    After filing the New York Litigation, Citibank together with its co-conspirators, █████████████████████████████████████████████████

█████████████████████

106.    ███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████

107. 

108.     In September 2005, Citibank and the PT representatives in the Pension Funds obtained under suspicious circumstances decisions from Brazilian courts that allowed them to take control of Brasil Telecom appointing Citibank's agent in Brazil, Sergio Spinelli, as chairman of the board and a right hand man of Andrade Gutierrez, Ricardo Knoepfelmacher, as Chief Executive Officer.  The Pension Fund lawyers involved in obtaining this suspicious decision included lawyers in the Andrade Fichtner firm who have recently been implicated in a corruption investigation involving the governor of Rio de Janeiro.

109.     After taking control of Brasil Telecom, Citibank and the PT representatives of the Pension Funds opened up a new front in the attacks by having Brasil Telecom's internet portal, iG, pay journalists associated with the PT regime and its allies to ramp up the press campaign against Mr. Dantas, Mr. Ferman, and Opportunity with the objective of promoting a trial by media and negatively influencing the courts against Mr. Dantas and Opportunity.  The magazines and websites of these journalists systematically attacked Opportunity in hundreds of negative articles.  One of these journalists has since acknowledged that he was hired by Citibank's and the Pension Funds' appointees at Brasil Telecom based on his history of attacking Mr. Dantas.  Brasil Telecom was also used to

fund attacks on Mr. Dantas and Opportunity by Citibank's and the Pension Fund's long time agents, like Luis Roberto Demarco.

110.    After taking over control of the Portfolio Companies, Citibank and the Pension Fund's appointees at Brasil Telecom ███████████████████████ to manufacture false allegations of wrongdoing that supposedly occurred during the period that Opportunity controlled the company.  These allegations twisted internal Brasil Telecom information and focused on Opportunity's prior position in the Brasil Telecom control structure without regard for the fact that the company's management, and not Mr. Dantas, made operational decisions.  The false allegations of mismanagement at Brasil Telecom were fed to the Brazilian press, including in press conferences held with much fanfare that resulted in scores of articles repeating the false accusations.  In the wake of this publicity, the false allegations against Mr. Dantas and Opportunity were fed to the CVM (Brazil's equivalent of the SEC) and other regulatory agencies.  These agencies, which were staffed by individuals beholden to the PT Party like a former Pension Fund lawyer who ran the CVM, readily commenced baseless administrative proceedings against Mr. Dantas, Mr. Ferman, and Opportunity.  Brasil Telecom, under the direction of Citibank and the PT managers of the Pension Funds, similarly brought unjustified civil proceedings against Mr. Dantas and Opportunity relying on the same false allegations.

111.    In all, these tactics fed a cycle where fabricated charges generated extensive press coverage that was then used to help feed and sustain governmental action.  In the eyes of the public, the governmental action in turn seemed to legitimatize the original baseless accusations and created a receptive environment for new attacks (in the press and with governmental authorities) that further fed the cycle creating a deliberate snowball effect.

The intended lesson, as was communicated to targets of the PT regime and its allies like Mr. Dantas, was that innocence was irrelevant because allegations and investigations could and would be manufactured even in the absence of a crime or illegality.

████████████████████████████████████████████████
████████████████████████████████████████

112.    Although it was not publicly known at the time, Mr. Dantas and Opportunity recently learned that ███████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████

███████

113.    In mid-2005, the Brazilian congress established a joint parliamentary committee of inquiry ("CPMI") in response to allegations regarding monthly payments or "Mensalão" to Brazilian lawmakers in return for their votes. The CPMI also inquired into the relationship between Citibank and the Brazilian government and, in particular, the Citibank Put.  The CPMI was led by Senator Delcidio do Amaral, the leader of the PT Party in the Senate, who has since been arrested for corruption in Brazil, including for his involvement in the overpriced acquisition of Pasadena by Petrobrás for which Citibank provided a fairness opinion. The reporter for the CPMI was Congressman Osmar Serraglio.

114.    ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████████

███████

36

115.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ harshly negative article against

Mr. Dantas, purportedly linking him to the Mensalão scandal shortly before Mr. Dantas was

summoned to be deposed before the CPMI.

116.    Also in August 2005, Mr. Dantas's lawyer received a message from one of

the Pension Funds' lawyers warning that he would be jailed if he disclosed in his CPMI

testimony facts related to the charge that the Pension Funds and Citibank had bribed the

President of the highest non-constitutional court in Brazil (the "STJ") to obtain favorable

decisions in their litigation with Opportunity concerning Brasil Telecom.

117.    Also in August 2005, Luis Roberto Demarco, ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Demarco has been identified in Italian

investigations as an agent of Telecom Italia and the Pension Funds who, among other

conduct, bribed Brazilian authorities and manipulated Brazilian press.  Mr. Demarco was

also a known fundraiser for the PT Party and has been investigated in Brazil for bribing

authorities to act against Opportunity.  Citibank, in connection with its 2005 deal with the

Pension Funds blessed by the PT regime, paid Mr. Demarco $7.5 million at the request of

the Pension Funds.  This payment, supposedly a "settlement" of aspects of claims in a

Cayman Islands litigation, was for substantially more than Mr. Demarco's asserted damages

against Opportunity.  One of Telecom Italia's executives has testified to Italian prosecutors

that Citibank also invested millions of dollars in Mr. Demarco's companies, according to Mr. Demarco himself.

118. ██████████████████████████████████████████

████████████████████████████████████████

████████████████████ Five days later, an article appeared by the journalist falsely claiming a link between Mr. Dantas and the Mensalão.

119. By March 2006, the CPMI was nearing completion of its work.

120. ██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

121. ██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

122. By the end of March 2006, Deputy Serraglio had finished his report on behalf of the CPMI.  An early draft of his report from November 2005 had not mentioned Brasil Telecom at all.  In a March 29, 2006, draft, however, there was a new section discussing supposed connections between Brasil Telecom and the Mensalão scandal. ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ this section of Deputy Seraglio's report did not mention

Mr. Dantas or Opportunity, let alone suggest they were guilty of any wrongful conduct.  Nor

did Deputy Serraglio include Mr. Dantas among the 40 persons for whom indictments were

recommended in this version of the report.

123.    Deputy Seraglio's report did, however, characterize the Citibank Put as a

suspicious contractual right given to Citibank for no consideration, despite being worth over

R$1 billion. ████████████████████████████████████████████

████████████████████████████████

124.    ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

125.    On April 4, 2006, the 65th Meeting of the CPMI was held, ostensibly to

discuss and vote on the report of the CPMI prepared by Deputy Serraglio.  The Chairman of

the CPMI, Senator Amaral, however, announced that the PT leadership in Congress had

decided instead to hold a vote on a different version of the report (the "Altered Mensalão

Report").  This replacement version of the report contained a chapter dedicated to

Mr. Dantas and Opportunity and their alleged illicit relationship with Marcos Valerio, a key

figure in the Mensalão scandal, and requested the indictment of Mr. Dantas. ██████████

████████████████ in the Altered Mensalão Report██████████████████████

████████████████████████████████

126.    The Altered Mensalão Report falsely alleged that Mr. Dantas "spared no efforts, and channeled resources" to Mr. Valerio's companies to "influence government decisions" and for "persuading and pressing politicians and leaders of pension funds not to remove him from control of Brasil Telecom" and other Portfolio Companies.  The report further falsely asserted that Opportunity entities under the direct control of Mr. Dantas had directly entered into contracts of significant magnitude with Mr. Valerio and his companies for these purposes.  The report offered no explanation for how it could possibly make sense for Mr. Dantas to be a key financial backer of the PT regime, when not only had he never received any benefits from the regime, it had aggressively, systematically, and continuously acted to oppose him.  The Altered Mensalão Report also failed to account for the fact that no Opportunity entities entered into any contracts with Mr. Valerio or his companies, let alone for the illicit purposes suggested; the only contracts actually at issue were advertising contracts entered into by Portfolio Companies, which companies had their own management responsible for such matters.

127.    The Altered Mensalão Report also entirely modified section 9.7.3.12.1.1 of Deputy Seraglio's March 29 draft, titled "Put Agreement with Citigroup related to Brasil Telecom's share."  In its revised form, this section no longer contained the analysis incriminating Citibank and the Pension Funds that had been in the version of the report prepared by Deputy Serraglio.  The revised section ended, however, with a new recommendation of further "research" regarding a possible indictment of Mr. Dantas even though he not only was never a party to the Citibank Put, but its existence was hidden from him until after Citibank had betrayed Opportunity ██████████████████████

████████████████████████████████████████████████

40

██████████████████████████████████████████████████████████

██████████ .

128.    On April 5, 2006, the Altered Mensalão Report was approved in a vote that sparked controversy.  Multiple Congressmen complained about the arbitrary procedures that had resulted in a new version of the report replacing the report prepared by the CPMI Reporter.  Senator Amaral, the Chairman of the CPMI, has since been arrested and, in plea bargain testimony, revealed that the contents of the Altered Mensalão Report were based on illegal and politicized negotiations to ensure the exclusion of any allegations against President Lula and his son in the final Mensalão CPMI report.

129.    After the CPMI vote but before the Altered Mensalão Report was public, initial news reports indicated that the CPMI had not recommended the indictment of Mr. Dantas ███████████████████████████████████████████

████████████████████████████████████████████████

██████████

130.    Opportunity subsequently learned that before the Altered Mensalão Report was finalized an individual named Adair Carneiro brokered a meeting in the Brazilian capital of Brasilia between Senator Amaral, the chairman of the CPMI, and Paulo Marinho and Mr. Knoepfelmacher, who at this point had been appointed by Citibank and the PT representatives in the management of the Pension Funds as the CEO of Brasil Telecom.  On the same trip, Messrs. Marinho and Knoepfelmacher also met with Senator Ideli Salvati, another PT Party representative on the CPMI.  Alberto Guth of Angra Partners ███████████

████████████████████████████████████████████████

█████████████████████

131.     After the meetings with Senators Amaral and Salvati in Brasilia, Mr. Carneiro overhead a telephonic conversation in which Mr. Marinho reported that there had been an agreement with the Senators that Mr. Dantas's name would be included on the list of those recommended for indictment by the CPMI and that Telecom Italia and Citibank should be informed.  Senator Salvati was later lauded in the PT-aligned press for "her heroic effort" in acting in a "technically irregular way" to ensure "that the name of Dantas was included among those" who should be indicted according to the final CPMI report.

132.     The Altered Mensalão Report greatly increased the pressure that Mr. Dantas and Opportunity faced.   While those who were really responsible for funding the takeover of the Brazilian state by the PT Party and its coalition partners remained insulated from scrutiny, Opportunity and Mr. Dantas became scapegoats at the center of an enormous scandal and the ██████████████████████████████████████████████████ ███████████ This campaign of misinformation led the public to believe that any and all legal actions against Opportunity and Mr. Dantas were justified, notwithstanding their lack of merit and illegality.

133.     After the Altered Mensalão Report became public, █████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████

134.     Almost immediately upon the public issuance of the Altered Mensalão Report, Citibank argued in a submission in the New York Litigation that among the reasons why Opportunity should be enjoined from retaking control of Brasil Telecom was that "a Congressional Panel of Inquiry in Brazil has today issued a report recommending that

Daniel Dantas and Carla Cico be indicted in Brazil for illegal actions while in control of Brasil Telecom."  The Altered Mensalão Report thus doubly served Citibank's interests in the New York Litigation, by █████████████████████████████████████████████ ███████████████████████████████████████

135.   The ███████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ This ultimately led to the arrests of Mr. Dantas, Mr. Ferman, and others at Opportunity in 2008.  The Brazilian Supreme Court itself found these arrests were baseless and illegal, and all the charges brought against Mr. Dantas and Mr. Ferman as a result of Operation Satiagraha, as with Operation Jackal, have been recently dismissed by the Brazilian courts, although not before causing tremendous reputational and other harm.

136.   ████████████████████████████████████████████████████ are consistent with other evidence of how the apparatus of the Brazilian government was turned against Mr. Dantas, Mr. Ferman, and Opportunity by Citibank and its co-conspirators.  For example, in notebook entries from 2005 and 2006 after Citibank allied with the PT representatives in the Pension Funds, Alberto Guth of Angra Partners recorded the cost to bribe Brazilian judges to obtain favorable opinions, including a price of "Costs + R $10M" to "Reinforce access to Justices" of the "STJ"—the highest Brazilian court for non-constitutional matters which was hearing cases concerning Opportunity's control rights with respect to the Portfolio Companies.  In another notebook entry, Mr. Guth recorded how "FIA [the Onshore Fund] bribes judges through lawyers."

137.    There is abundant evidence of similar wrongful actions taken against

Mr. Dantas.  For example, ███████████████████████████████████

████████████████████████████████████████████████████████████████

███████████    In the same vein, a Telecom Italia executive in Brazil instructed his team in

2009: "Let's find a friendly judge.  We pay, if necessary."[5]

138.    Brazilian authorities were also becoming notorious under the PT regime's

rule for brazenly engaging in illegal wiretaps and for doctoring the illegally obtained

evidence to suit their wrongful purposes.  In August 2007, VEJA magazine published an

article titled "The Shadow of the Police State" describing how even Supreme Court

---

[5] Telecom Italia's corrupt attacks were



ministers had become subject to wire-tapping by the "rotten gang" of the Federal Police, citing evidence of the manipulation of the contents of recordings, and criticizing the practice of leaking telephone conversations for coercive purposes.

139.    In a letter that was published in the Brazil press, one Supreme Court minister decried the regime's attempts "to get around the guarantees of the Democratic State of Law, improperly creating a subsystem that considers it natural and desirable to judge and punish summarily, through the press."  This Minister noted, among other things, how through wiretaps and otherwise, Brazilian judges "who would not bend before the designs" of authorities "would have their names recklessly linked to untrue facts or episodes with no connection to their professional or personal lives."  He emphasized that this created a system where the judiciary had the "feeling that they had no freedom to judge" resulting "in a dangerous movement towards the creation of a Police State."

### H)     The PT Party and its Allies in the Regime Perceive that Mr. Dantas Poses an Existential Threat to Their Power

140.    Over time, elements within the Brazilian state increasingly began to believe that Opportunity posed an existential threat to their power and to their corrupt modus operandi.  This perception was originally fed by Telecom Italia's manufactured efforts to show that Opportunity had hired Kroll to spy on the government and uncover evidence of corruption that Mr. Dantas would then disclose.  The fraudulent attacks against Mr. Dantas in Operation Jackal were intended to neuter this perceived risk to the regime.

141.    By 2007, two new events reinforced the regime's perception that Mr. Dantas and Opportunity were existential threats.  First, in July 2007, Opportunity filed Counterclaims in the NY Litigation detailing how Citibank allied itself with the corrupt Brazilian regime in return for commercial rewards and denouncing corruption by the PT

regime, including in its relations with Telemar.  These counterclaims, which would be decided at a jury trial in a U.S. jurisdiction with fulsome discovery rules and untainted by any corruption or political influence in the Brazilian judiciary, threatened to reveal publicly the kind of wrongdoing that was the foundation of the PT regime's and its allies' power. Second, also in July 2007, Opportunity filed a petition with Italian prosecutors investigating wrongdoing by Telecom Italia in connection with its operations in Brazil.  In October 2007, Mr. Dantas was summoned to testify in the Italian investigation as a victim of Telecom Italia's conduct, intensifying the perception that he could and would connect the dots that would unravel the PT regime corruption that has no become public ███████████

████████████████████████████████████████████████████████

███████████████████████████

142.     As discussed further below, these events firmly convinced elements within the PT regime and its allies that Mr. Dantas intended to take them down, even when he was doing no more trying to defend himself against fraudulent attacks in Brazil and in the New York Litigation.  These individuals in the regime concluded that protecting the PT Party and its allies would require dramatic action to silence Mr. Dantas and cause him to lose all credibility in the public eye.  The threat to the regime and its corrupt way of governing was especially acute because of the perceived risk that Mr. Dantas's conduct in Italy and in the New York litigation would cause *foreign* law enforcement to set their sights on investigating the corruption in the Brazilian state.  While elements within the PT regime and its allies had significant influence to ensure favorable outcomes within factions of Brazilian law enforcement and the Brazilian judiciary, the regime and its corrupt way of making politics in Brazil would have been exposed to inquiries by non-Brazilian authorities.

143.    Mr. Dantas was aware of the likelihood that the regime would want nothing more than to protect itself by coming after him and his associates again.  Indeed, in a profile with a leading Brazilian magazine in June 2007, Mr. Dantas was asked expressly whether there was anything he feared.  He identified only one thing:  "The Federal Police."  His concern, as he later commented, was the authorities' demonstrated willingness to act against him without regard to their proper institutional role.

144.    Mr. Dantas's state of mind was based on years of fraudulent accusations, attacks, and innuendo.  In 2006, Mr. Dantas was asked to attend a dinner at the home of the Brazilian Senator, Heraclito Fortes to meet the then-Minister of Justice, Mr. Thomaz Bastos.  The future PT Minister of Justice, Congressman José Eduardo Cardoso, as well as a PT regime lawyer Sigmaringa Seixas, also were present at the dinner.  The dinner was a reaction to a magazine article that falsely accused Mr. Dantas of obtaining and disclosing information about illegal foreign accounts of senior PT Party officials, including President Lula, Minister Thomaz Bastos, Luís Gushiken, a former PT Party Communications Secretary who effectively controlled the Pension Funds and was a key confidant of President Lula, and Paulo Lacerda.  Mr. Dantas assured those at the dinner that he had not been responsible for giving the material to the press.

145.    Minister Thomaz Bastos was not interested in Mr. Dantas's denials.  He reminded Mr. Dantas of how the government had responded under his direction to rioting that was then occurring in São Paolo.  Faced with violence that left more than 150 people dead and attracted worldwide attention, Minister Thomaz Bastos had publicly declared his willingness to send in federal troops and take emergency measures to crack down.  Minister Thomaz Bastos pointedly asked for Mr. Dantas's agreement to the proposition that the

government could not tolerate challenges and emphasized that the government's response to such challenges would be overwhelming. Using a French phrase to describe the PT Party, he warned: "Cet animal est tres mechant; quand on l'attaque, il se defend ["This animal is very wicked; when you attack it, it defends itself]."

146.     Mr. Dantas also came to realize that if he and his associates at Opportunity continued to be targeted by the regime, the consequences could be dire—even worse than he had faced to date. For example, a few years earlier, a PT mayor of Santo André in the São Paulo region had learned of a corruption scheme that was said to have involved key figures in the Party like Chief of Staff Dirceu. This mayor, named Celso Daniel, was later kidnapped and assassinated. According to the mayor's brother, the assassination occurred right before the mayor was about to reveal that these senior PT figures were stealing for themselves funds earmarked for the PT. Seven of the individuals under investigation in connection with Mayor Celso Daniel's assassination were thereafter themselves murdered in an apparently mysterious manner.

147.     In 2007, a former Brazilian Minster of Justice published a book that referred to allegations that Opportunity and Mr. Dantas had made in the New York Litigation regarding PT Party bribery demands. Referring to the incident when Celso Daniel had been assassinated, the book made the point that Mr. Dantas was the one "Daniel" who had not yet been murdered.

**I)     Citibank and the PT Regime Coerce Mr. Dantas, Mr. Ferman, and Opportunity to Release Citibank of Liability for Billions of Dollars of Claims as Part of the Politicized Sale of Brasil Telecom**

148.     In 2007, public reports began to appear that the Brazilian government wanted to create what it called a Brazilian "Supertele". This pretextual transaction was to be accomplished by the sale of Brasil Telecom to its competitor, Telemar, which had rebranded

48

itself as "Oi."  Telemar's controlling shareholder Andrade Gutierrez, a key political

contributor to the PT Party and other Brazilian parties, would be a primary beneficiary of the

sale.  Delivering Brasil Telecom to Oi would satisfy the objectives of a key PT regime ally

that was funding the regime's political goals.  Years earlier, Mr. Dantas and Citibank had

discussed the PT Party's interest in a politically motivated transaction involving Telemar,

which was notorious for having spent millions of dollars to acquire the video game company

run by President Lula's son.

149.    President Lula's then chief of staff Dilma Rousseff was intimately involved

in the coordination of the efforts to create this Supertele.  Senior PT Party officials pursued

these Supertele efforts even though Brazilian law prohibited a telephone concessionaire like

Oi controlling another telephone concessionaire.

150.    A former director of Andrade Gutierrez warned Mr. Dantas that he could not

oppose the creation of the Supertele as it was a campaign commitment by the PT Party

toward a firm that financed the party's activities.

151.    Luiz Eduardo Greenhalgh, one of the founders of the PT Party who had acted

as President Lula's lawyer, approached Mr. Dantas concerning the potential Supertele

transaction.  Mr. Greenhalgh had previously tried to diffuse the attacks on Opportunity by

the PT regime's representatives in the Pension Funds.  Recognizing that his allegiances

would always remain with the party, Opportunity had retained Mr. Greenhalgh to review the

Kroll materials and to confirm directly to senior PT officials that Mr. Dantas had never

sought to have Kroll spy on the PT Party administration and had no intention of denouncing

the regime.

152.    Mr. Greenhalgh, Mr. Dantas, and Humberto Braz, an Opportunity consultant who had previously worked at Andrade Gutierrez and had been Chief Executive Officer of Brasil Telecom's holding company, had numerous conversations concerning the Supertele and the politicized circumstances surrounding that transaction.

153.    When they first began discussing the Supertele transaction, Mr. Dantas had argued to Mr. Greenhalgh that he would be an appropriate partner in a national company given his deep Brazilian roots.  Mr. Greenhalgh was dismissive, indicating that Mr. Dantas had to sell and would never be able to fight the state.  He noted that Sergio Rosa, the head of the Previ pension fund and a key ally of the powerful government minister Luís Gushiken, was actively working on behalf of the Supertele transaction.

154.    In or about December 2007, an entrepreneur who did business with Brasil Telecom informed Mr. Dantas that he would be "handled with force" and Oi was paying Paulo Lacerda, then the head of the ABIN, to arrest him.[6]  This threat had particular force since Mr. Lacerda was closely connected to the still powerful former Justice Minister Thomaz Bastos, who had previously threatened Mr. Dantas and was known as "Lula's Shield" given his role in protecting the regime and appointing PT Party allies throughout the judiciary.  Mr. Lacerda had also been head of the federal police at the time it brought fraudulent charges against Mr. Dantas in Operation Jackal and Mr. Thomaz Bastos too had been central to the Jackal persecution and in publicizing the false accusations against Mr. Dantas to the press.  Citibank had itself been told by a top official in the PT government that they were relying on then-Minister Thomaz Bastos to handle the issues relating to Kroll through his supervision of the Federal Police and the courts.

---

[6]  Later, it was found that Mr. Lacerda had also been paid by Telecom Italia to attack Mr. Dantas.

155.    Mr. Dantas increasingly came to understand the ominous significance of Mr. Lacerda's and Mr. Thomaz Basto's prior involvement in bringing false criminal charges against him.  Lest there be any doubt about how to interpret the signs, the entrepreneur that had approached Mr. Dantas expressly reminded him that the use of the police to coerce agreements was not a new tactic and had, for example, been used by Telecom Italia in connection with Operation Jackal.

156.    In or around the same time, Guilherme Sodré, who had assisted Opportunity in attempting to clarify false statements others had made to certain journalists and who had certain political connections, attended a meeting with Fernando César Mesquita, the Director of Communications for the Brazilian Senate, and Reinaldo Almeida Cesar, a Brazilian police officer in charge of security for a former Brazilian president.  They told Mr. Sodré that Mr. Dantas would be arrested if he continued to cooperate with and send documents to Italian prosecutors investigating wrongful conduct by Telecom Italia.  Mr. Sodré also warned Mr. Dantas that Mr. Lacerda, the head of the ABIN, was going to put Mr. Dantas in handcuffs for his cooperation with the Italian investigation.

157.    Mr. Dantas thereafter sought, through his lawyer, to explain to Mr. Lacerda that he was not responsible for Kroll's being hired, that he had not asked Kroll to spy on the government, that he had no political intention against the government, that his cooperation with the Italian prosecutors was only so he could obtain documents from the Italian investigation to help his defense in Operation Jackal and related proceedings, and that he was not involved in any investigation of purported payments to Brazilian officials' foreign bank accounts.  The message Mr. Dantas received back was that he should not make himself an obstacle to the will of the government and that there is no way to withstand the force of

the state.   Mr. Dantas was also advised that he should not count on innocence to protect him from attacks, since representatives of the regime would be willing to imprison him based on manufactured evidence.

158.   Mr. Dantas was extremely concerned for himself, his family, and for his associates at Opportunity based on the threats communicated by Mr. Sodré and the response from Mr. Lacerda.  He approached Mr. Greenhalgh to discuss the situation.

159.   Mr. Greenhalgh informed Mr. Dantas that several high ranking PT Party officials were acting against him due to the perception that the Kroll investigation was a potential threat to the regime's power, because Mr. Dantas had provided testimony and evidence to Italian prosecutors investigating corruption within the Brazilian state, and because Opportunity had made allegations about corruption in the New York Litigation that were not well regarded by the regime.  Mr. Greenhalgh made the point that a lawyer at the firm representing Citibank in Brazil was very close to the top echelon of the PT Party leadership and had warned PT Party officials of the risk to the Party caused by the sensitive issues Opportunity had raised in the New York Litigation.

160.   Mr. Greenhalgh also said that certain individuals were seeking to instigate concern within the PT regime based on the possibility that U.S. law enforcement might begin investigating corruption in the PT regime because Opportunity had put Citibank on notice of bribery of both the President of the Superior Court of Justice, Minister Vidigal, and a First Instance Justice, Marcia Cunha, in connection with their decisions enabling Citibank and the Pension Funds to usurp control of Brasil Telecom[7].  This concern about the involvement of U.S. law enforcement was not hypothetical:  in December 2007, in the

---

[7]  Mr. Greenhalgh would later inform Mr. Dantas that he had obtained confirmation that Minister Vidigal had indeed been bribed.

middle of the Supertele discussions, Italian authorities sought cooperation from U.S. authorities after taking testimony from Mr. Dantas, including regarding evidence in the New York litigation with Citibank.

161.    Mr. Greenhalgh also emphasized that former Ministers Thomaz Bastos and Gushiken, as well as Mr. Lacerda, all wanted to put Mr. Dantas in jail.   He emphasized in particular that Mr. Lacerda was closely connected to Mr. Thomaz Bastos, who, although no longer formally in the government, continued to exercise influence in the Federal Police, in certain courts, and among prosecutors.  Mr. Greenhalgh further informed Mr. Dantas that Mr. Gushiken effectively controlled the PT representatives in the management of the Pension Funds, a blogger on the payroll of Brasil Telecom, and others who had engaged in illicit conduct against Mr. Dantas and Opportunity such as Mr. Demarco.  Mr. Greenhalgh also explained that there were internal disputes among different factions in the PT Party who were contesting for their share of power.

162.    By January 2008, the press had begun to report a proposed price for Oi's acquisition of Brasil Telecom.  Opportunity was informed by agents of the Pension Funds that this price had been dictated by Oi and the state development bank (BNDES) and that Opportunity would not have any ability to negotiate.

163.    Mr. Dantas discussed this situation with Mr. Greenhalgh who reiterated that Opportunity should sell regardless of whether it was on adequate terms.  His express rationale:  Mr. Dantas, Mr. Ferman, and Opportunity were not really selling their interests in Brasil Telecom but buying peace—*i.e.*, a cessation of the hostilities unleashed against them —in an environment where many of the most powerful officials of the PT Party and its allies viewed Opportunity as a threat to the continued existence of the regime and the corrupt

political system.  Mr. Dantas understood that Mr. Greenhalgh, who often reiterated that his primary loyalty was to the PT Party, was not just delivering his personal opinion, but expressing the *quid pro quo* position of the PT regime—*i.e.*, if Mr. Dantas wanted the campaign against him, his associates, and entities to end, cooperation in the Oi transaction was the price.

164.    Throughout this period Mr. Dantas had been keeping Mr. Ferman informed about the warnings and signs he was receiving and the threats that were being made.  In these circumstances, Mr. Dantas and Mr. Ferman resigned themselves to selling the various Opportunity entities' stake in Brasil Telecom at the price that had been set.

165.    As discussions progressed, Mr. Dantas insisted, however, that he, Mr. Ferman, and Opportunity should be able to reserve their right to seek compensation from the Pension Funds, Citibank, and others for the reputational and other harm caused by their wrongful conduct over the years.  The value of these claims—in the billions of dollars—exceeded the value of Opportunity's stake in Brasil Telecom itself.

166.    Mr. Dantas discussed this issue with Otavio Azevedo, the president of Andrade Gutierez who was also the Chairman of the Board of Directors of the holding company that controlled Oi and its lead negotiator for the Supertele transaction.  Mr. Dantas understood that Oi, as a condition precedent to the transaction, required a full resolution of the litigations that could affect control of Brasil Telecom.  Mr. Azevedo told Opportunity representatives that Oi did not care about the various fights among the Brasil Telecom partners, provided they did not implicate Oi's ability to obtain clear control of Brasil Telecom and not get caught up in the ongoing control battles.

167.    In early 2008, the Brazilian press began to report that the Supertele transaction was being held up by Opportunity's insistence on preserving its litigation claims. Mr. Greenhalgh told Mr. Dantas that factions in the PT Party believed that he was sabotaging the creation of the Supertele by refusing to give releases as part of the transaction. And Mr. Greenhalgh explained that these individuals in the PT were adamant that Opportunity would need to provide releases to the Pension Funds and their representatives, since the PT regime did not want to take any risk in leaving party members at the mercy of the courts.

168.    Once again, Mr. Dantas came to understand that, faced with this coercion, he, Mr. Ferman, and Opportunity had no alternative but to agree not to pursue claims against the Pension Funds.[8]

169.    Still, Mr. Dantas sought at least to preserve his, Mr. Ferman's, and Opportunity's claims against Citibank. He saw no basis, even pretextually, for the PT Party to coerce a release on behalf of a third-party U.S. financial institution.

170.    Mr. Dantas's focus on preserving claims against Citibank was driven by his belief that—after the Oi transaction and given the notice that Opportunity had given Citibank's highest executives regarding bribery and corruption in the Brazilian judicial system—Citibank would have to face claims on its own, on a more level playing field, without the support of the PT representatives in the management of the Pension Funds and the PT regime and without the benefit of further wrongful attacks against Mr. Dantas from

---

[8] Issues related to the coercion that left Mr. Dantas, Mr. Ferman, and Opportunity with no alternative but to not pursue claims against the Pension Funds and transfer their interests in Brasil Telecom as part of the Supertele transaction are beyond the scope of this action and not described in full detail herein. Plaintiffs reserve all rights with respect to these separate issues of duress.

the Brazilian State apparatus. This would hopefully allow for an impartial assessment of Citibank's liability for Opportunity's damages, with a diminished risk that the Brazilian courts would rule based on bribery and political influence, rather than on the merits.

171.    Opportunity was already preparing claims under Brazilian law to be filed in the Brazilian courts seeking compensation for billions of dollars of reputational harm, unjust enrichment, and related damages for which Citibank was liable.

172.    In an effort to minimize the impact caused by being forced to forego claims against the Pension Funds, Opportunity proposed that rather than providing a release of claims, it would instead covenant not to bring suit against the Pension Funds and their agents. Given Brazilian law governing contribution rights in the face of a covenant not to sue, Opportunity's proposal meant that Citibank would remain subject to full liability for the harm Mr. Dantas, Mr. Ferman, and Opportunity had suffered from its collusion with the PT Regime, the PT Party representatives in the management of the Pension Funds, and others with whom they collaborated.

173.    In prior discussions with Opportunity's lawyers, Citibank had indicated that it would be amenable to a settlement agreement in which both it and Opportunity preserved all existing claims. By this time, however, Citibank had begun to realize that Opportunity was seeking to preserve the right to hold Citibank jointly and severally liable for all of Opportunity's damages. Mr. Spinelli, Citibank's lead negotiator in the Oi transaction, questioned Opportunity's proposal of a covenant not to sue rather than a release of Pension Fund claims and told an Opportunity in-house counsel that they suspected that Opportunity intended to use the argument of joint-liability to seek to collect full damages from Citibank.

174.    Mr. Spinelli made clear to Opportunity that Citibank would not accept being left out of the releases.  He emphasized that the Oi transaction was a presidential decision and expressly warned that the government would take charge and force Opportunity to grant Citibank a release.

175.    At approximately this same time period, Luigi D'Eclesia, a consultant for Brasil Telecom who had previously represented Telecom Italia, conveyed a message from Paulo Marinho to Mr. Dantas.  Mr. Marinho had been an agent of both TIW and Telecom Italia and had been working for Citibank and its conspirators through his retention by Brasil Telecom.  In 1999, Mr. Marinho and his colleague Nelson Tanure, acting on behalf of TIW, had met with Mr. Dantas at a Sheraton Hotel in Rio.  At this meeting, they urged Mr. Dantas to pay Mr. Demarco to settle a litigation filed against Opportunity that was pending in the Cayman Islands, warning that there was a trap by the Federal Police to arrest Mr. Dantas and that the personal safety of Mr. Dantas's nephew was in jeopardy.  The message from Mr. Marinho in 2008 was that Mr. Dantas should not forget the meeting at the Sheraton Hotel, Mr. Dantas was getting too old not to learn the lesson that fighting the PT regime would put his and his family's safety at risk, and Mr. Dantas should end all litigation.

176.    While the coercion was leaving them with fewer and fewer options, Mr. Dantas, Mr. Ferman, and Opportunity still had some hope that they would be free to negotiate fairly with Citibank without facing the kind of the coercion that had forced them to agree to sell their Brasil Telecom shares at a depressed price and provide the Pension Funds with the releases that had been demanded.  Accordingly, Mr. Dantas, Mr. Ferman, and Opportunity rejected releases drafted by Citibank that did not preserve their right to pursue claims against Citibank for harm to their reputation and impacts on their business.

Opportunity made its position clear: "The central issue for Opportunity has always been preserving its right to be made whole for the harm it has suffered, including, for example, by the Opportunity asset management companies.  It is not acceptable to try to force the Opportunity asset management companies to accept releases that would impair or eliminate their claims.…  Unless we resolve this issue, there is no possibility that progress will be made, because Opportunity cannot accept a resolution that satisfies the interests of other parties where it has no right to seek compensation for the harm to its franchise, and the related damages that have been suffered by the Opportunity asset management companies."

177.    Mr. Greenhalgh subsequently informed Mr. Dantas that he had consulted with senior officials of the PT Party in the government (one of whom, Mr. Dantas discovered, was Ms. Rousseff), and that Mr. Dantas, Mr. Ferman, and Opportunity must give the release demanded by Citibank since Citibank was considered a partner of the PT Party and would not be left by itself at the mercy of the courts.  Mr. Greenhalgh explained that one of the partners at Citibank's Brazilian law firm had even contacted a high ranking PT Party official to insist that the PT Party take action to ensure Citibank would never face claims from Opportunity.

178.    In the background,



179.

Mr. Azevedo has since been arrested as part of the "Operation Car Wash" scandal in Brazil

and has been charged with multiple counts of bribery, money laundering, and criminal organization in connection with corrupt activities involving the PT Party and the state oil company Petrobrás.  In plea bargain testimony, Mr. Azevedo stated that in 2008, the time of the discussions that led to the sale of Brasil Telecom to Oi, Andrade Gutierrez had acceded to a PT Party demand to pay bribes amounting to 1% of all of the firm's work.  In all, Mr. Azevedo said that from the start of the PT Party administration Andrade Gutierez paid over R$560 million in furtherance of a "good relationship" with the PT regime.

180.    At the end of March 2008, the parties discussing the Oi transaction met at the Onshore Fund lawyer's law firm.  Citibank had continued to fight tooth and nail to get the releases it desired from Mr. Dantas, Mr. Ferman, and Opportunity.

181.    At the meeting, Mr. Spinelli told Opportunity that Mr. Dantas "could hide but not escape" and that Opportunity would have to give Citibank all that it demanded. Mr. Spinelli emphasized that the Brasil Telecom purchase agreement included a significant penalty provision requiring Oi to pay R$490 million if Brazilian law was not changed in an agreed timeframe to make the Supertele transaction permissible.  Mr. Dantas, Mr. Ferman, and Opportunity understood Mr. Spinelli's point as a demonstration that Citibank had the allegiance of the PT regime in pursuing its inclusion in the release.

182.    Sergio Rosa of Previ and Mr. Azevedo of Oi thereafter met with Mr. Braz and informed him that a release for Citibank was mandatory.  Mr. Rosa emphasized that Citibank was an ally of the PT Party and the Brazilian government and would not be left exposed. Mr. Dantas knew that the success of the Supertele transaction did not turn on the scope of any release Citibank might obtain from Opportunity.  But it was nonetheless clear by this time that Citibank had enlisted the Brazilian government as an accomplice to ensure

Citibank would achieve its ends.  In short, by making additional concessions from Opportunity the price for closing a transaction that the PT Party and its benefactors desperately wanted, Citibank gained the benefit of the full coercive power of the regime to force Mr. Dantas's, Mr. Ferman's, and Opportunity's acquiescence.

183.    During the Supertele "negotiations," Mr. Azevedo would often show up at the end of the day and express irritation at the lack of progress, shouting that President Lula's Chief of Staff, Ms. Rousseff, was upset by the delay, as was the state development bank, BNDES, which was financing the transaction and was also pressuring for it to close[9]. On one occasion, Mr. Azevedo made a call in the presence of Opportunity and other parties to complain about their failure to finalize the transaction.  After hanging up, Mr. Azevedo said he had been speaking to Ms. Rousseff, who was annoyed.

184.    During this period, Mauro Salles, who had been an advisor to Brasil Telecom and Opportunity, met with Luiz Gushiken and Delfim Neto, a prominent former congressman who was also a former Minister of Finance.  Based on this conversation, Mr. Salles advised Mr. Dantas that Opportunity could not resist the forces of the state and that he should not underestimate the state's willingness to act outside of the law.  He reminded Mr. Dantas that legality was not an obstacle for those in power, a point that had also been made to Mr. Dantas in connection with the attacks by Telecom Italia.  He also reported to Mr. Dantas that all the state initiatives against him and associates, in particular from the federal police, the tax authorities, the Brazilian central bank, and the CVM, were part of a coordinated effort led in significant part by Mr. Gushiken and Mr. Thomaz Bastos.

---

[9]  As with so many other state actors, BNDES is also now under investigation for, among other things, its involvement in bribes that benefited the PT regime.

185.    Over time, the pressure on Mr. Dantas, Mr. Ferman, and Opportunity increased even further.  At one point, Mr. Dantas found himself standing next to former Minister of Justice Thomaz Bastos at the airport.  This meeting was plainly calculated by Mr. Thomaz Bastos, who proceeded to tell Mr. Dantas that he admired Mr. Dantas's work, that he knew Mr. Dantas was competent of doing some other kind of work, and, accordingly, he should agree to the government's agenda and put an end to all litigations.  Mr. Dantas, who understood that Mr. Thomaz Bastos's continuing role in the PT regime included his power to cause the police and prosecutors to pursue an endless number of groundless investigations against him, recognized the implicit threat immediately if he did not agree to Citibank's demands.

186.    Consistent with Mr. Dantas's concerns, journalists affiliated with Citibank and its co-conspirators and the PT regime reported that Federal authorities were moving toward arresting Mr. Dantas.  One such report appeared on March 21, 2008, ███████████ ███████████████████████████████████████████████████████████ ███████  This item, by Ucho Haddad, stated that federal authorities were studying "the best way to cage" Mr. Dantas and "If the precise information received by the column is confirmed, fireworks, the length and breadth of the country, will be the envy of the most spectacular pyrotechnic displays at New Year's."  Other journalists similarly indicated that the government planned to send Mr. Dantas to jail.

187.    On April 18, 2008, Opportunity's public relations consultant received an email from a journalist at *L' Uomo* magazine asking Opportunity to comment on the impending arrest of Mr. Dantas and a plan to prevent the superior courts from releasing him. The journalist reported that his source was Mr. Demarco.  Shortly before this occurred,

Frank Holder, who had been a senior executive at Kroll, advised Mr. Dantas that this same journalist had talked to Mr. Demarco and that there was an orchestrated effort to arrest Mr. Dantas.

188.    Mr. Dantas recognized these events as messages from factions within the PT regime intended to threaten him that if he and others at Opportunity continued to stand in the way of the Supertele transaction by refusing to provide releases to Citibank they faced the destruction of the Opportunity businesses and the loss of their liberty.  While Mr. Dantas and Opportunity had been in ongoing discussions with Citibank to see if they could obtain any concessions at all with respect to the release and other deal terms, it was becoming ever more clear that Citibank had incentivized the government to require Mr. Dantas, Mr. Ferman, and Opportunity to acquiesce in full to Citibank's demands.

189.    Mr. Dantas approached Mr. Greenhalgh about the disturbing reports in the press and his concerns that they reflected a scheme to arrest and destroy him, his associates at Opportunity, and their businesses.  Mr. Greenhalgh said that the sources for these reports were Opportunity's enemies in the PT regime.  The only potential remedy, Mr. Greenhalgh said, was for Mr. Dantas to stop trying to negotiate and accept the terms of the Supertele deal on the table.  This meant Mr. Dantas, Mr. Ferman, and Opportunity would have to agree to provide the releases and accept the conditions that Citibank required to allow the Oi transaction to proceed.  It also meant that Mr. Dantas, Mr. Ferman, and Opportunity would have to agree to another concession that Citibank had raised relating to tens of millions of dollars in investment proceeds that were at issue in the New York Litigation.  Citibank was insisting that as part of any settlement, Opportunity would have to grant Citibank a

substantial interest, worth tens of millions of dollars, in these proceeds which were related to various entities called Highlake (the "Highlake Proceeds").

190.    Mr. Dantas had spent years standing up to the corrupt attacks organized by the PT regime and its allies.  He was painfully aware of the willingness of the PT regime to use the full power of the state to achieve its and its contributors' ends.  And his own experience had further confirmed that illegality was not an obstacle for those in power, just as he had been warned.

191.    Mr. Dantas, for example, knew he had been falsely accused in Operation Jackal and before the CVM and had faced several prior baseless arrest requests. Likewise, he knew that he had been falsely accused in the Altered Mensalão Report of being involved in funding the "big monthly payments" scheme.

192.    Mr. Dantas also knew that the Brazilian authorities were, despite his requests, not investigating the lawless nature and circumstances surrounding the origin of Operation Jackal.  He was also well aware that factions within the Brazilian media and judiciary were susceptible to corruption and illegal political influence.  Thus, he could not count on an impartial adjudication of the charges against him.  To the contrary, he had seen that representatives of the PT regime and its allies were prepared to generate new false accusations and investigations as needed to keep the pressure on him and his associates at Opportunity.  And, even if Mr. Dantas and his colleagues could count on ultimately being exonerated of whatever baseless and fraudulent charges were filed (which was a serious risk given the corruption in the system), in the meantime they faced incarceration in lawless prisons.  Moreover, Mr. Dantas knew that defending against trumped up charges would only further antagonize elements of the PT regime, who he and his colleagues would need to

accuse of wrongdoing in working to exonerate themselves.  This created the likelihood of still further aggressive retaliation.

193.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

194.    Also around the same time, Mr. D'Eclesia informed Mr. Dantas that Brasil Telecom, under the direction of Citibank and the PT managers of the Pension Funds, had extorted him through a fraudulent contract to buy non-existent software from a company owned by Mr. Demarco and that the money had been used to finance criminal initiatives against Mr. Dantas.  Mr. D'Eclesia was himself frightened by these circumstances and by the situation Mr. Dantas faced.  He warned Mr. Dantas that he had no way to face up to the state, and further warned that Mr. Dantas should take care as he was dealing with people who Mr. D'Eclesia believed had murdered others who threatened the regime's hold on power.

195.    Mr. Dantas ultimately met personally with Mr. Azevedo who was very agitated and shouted at Mr. Dantas that Chief of Staff Rousseff had herself determined that the Supertele deal should close by April 25 and that Opportunity needed to agree to what

Citibank was demanding so that could happen.  Also around this time, the *Folha de São Paulo* newspaper contacted Opportunity's public relations consultant asking her to comment on the information it had received that a new offensive would be launched and Mr. Dantas and ten other senior Opportunity executives would be arrested.

196.    Faced with this escalating illegal pressure, the threats of illegal arrest, threats of destruction to the Opportunity businesses, and Mr. Dantas's own prior experiences of suffering politicized and false attacks as part of the state's "dirty war" against him in support of those assaulting Opportunity's and the joint venture's rights, Mr. Dantas, Mr. Ferman, and Opportunity recognized that if they did not capitulate to the Citibank demands that the PT regime demanded in connection with the Supertele transaction, the regime would bring to bear against them the full power and authority of the Brazilian state acting in derogation of the law.

197.    Mr. Dantas, Mr. Ferman, and their colleagues also recognized that in defending against fraudulent charges they could not count on meaningful due process protections or judges and prosecutors who were seeking to do justice.  Rather, they knew that, under the PT regime, the administration of justice had been substantially politicized and corrupted, investigatory findings and rulings were routinely a sham, and the deterioration of the rule of law was pervasive.  Indeed, Mr. Dantas and his colleagues had long been completely stonewalled in their substantial efforts to have authorities commence investigations into the wrongdoing he, his colleagues, and Opportunity had faced.

198.    Given this duress, Mr. Dantas, Mr. Ferman, and Opportunity had no alternative but to provide the release to Citibank, and grant Citibank the rights in the Highlake Proceeds that it required, in order to avoid catastrophic harm.   Despite weeks of

trying to gain Citibank's agreement to arbitrate any future disputes between the parties under neutral arbitration procedures administered by the International Chamber of Commerce, Mr. Dantas, Mr. Ferman, and Opportunity were also forced to acquiesce to Citibank's requirement of a forum selection clause that provided for exclusive jurisdiction for the courts of Citibank's home jurisdiction of New York.

199.    On April 25, 2008, acting under coercion, Mr. Dantas, Mr. Ferman, and Opportunity signed the documents required to create the Supertele including a Comprehensive Settlement and Release Agreement with Citibank and its affiliates (the "Citibank Settlement").

200.    The Citibank Settlement includes provisions giving Citibank substantial rights to the Highlake Proceeds.

201.    The Citibank Settlement also included a release of any existing claim "that arises from, is based on or relates to," *inter alia,* (i) the agreements between Citibank and Opportunity, (ii) the facts or circumstances set forth in the pleadings in the New York Litigation, and (iii) the Pension Funds with respect to any of the foregoing agreements, facts, or circumstances (the "Release").  Subject to certain limitations, the entities and individuals who signed the Citibank Settlement also covenanted to cause their affiliates not to institute any such claims against Citibank (the "Covenant").[10]

202.    The Release and the Covenant foreclosed Mr. Dantas, Mr. Ferman, and Opportunity from pursuing in Brazil under Brazilian law planned claims to hold Citibank liable for the billions of dollars of franchise, reputational and related harm that Opportunity,

---

[10] The Release expressly excludes any claim, like the duress claims asserted in this litigation, arising out of the Citibank Settlement itself.  Citibank did not demand that the Release cover unaccrued claims, like the malicious prosecution claims asserted in this litigation.

Mr. Ferman, and Mr. Dantas suffered when defending Citibank's interests and later suffered at Citibank's hands once it had colluded and conspired with the PT representatives in the management of the Pension Funds, the PT regime, and other corrupt parties.

203.    When Citibank worked with the PT regime and its allies to coerce Mr. Dantas, Mr. Ferman, Opportunity to enter into the Release and Covenant and to grant Citibank rights to certain Highlake Proceeds, it knew those terms were obtained by duress, and knowingly took advantage of the benefits of that duress.

204.    On the day the Citibank Settlement was signed, Mr. Haddad reported on his blog that Mr. Dantas "has backed off and allowed the deal to go ahead, in exchange for suspension of a police operation that might have caused him headaches in the years to come."

205.    On November 20, 2008, President Lula amended by presidential decree the existing telecommunications law that prohibited Oi's acquisition of Brasil Telecom.  As described by the leading Brazilian newspaper *Folha de São Paulo*, this "presidential signature crowns a process in which public funds and interests were submitted to private schedules and demands".  Two days earlier, on November 18, 2008, President Lula had attended a dinner celebrating the 60th anniversary of the Andrade Gutierrez firm.

206.    The Supertele transaction closed in January 2009 with the Brazilian state bank providing Oi with billions of reais in financing.  Leading newspapers in Brazil criticized the PT Party's pursuit of the transaction, which they said undermined competition, benefited private groups, and created no jobs.

207.    By October 2013, Oi had been unsuccessful as a Brazilian conglomerate and was sold to Portugal Telecom.  By 2016, it became clear that Oi failed as a Supertele even

without Brazilian ownership, filing for bankruptcy in June with nearly $20 billion in debt.

An article in the Brazilian news magazine *IstoÉ* reported on the lessons to be drawn

regarding what happened:  "Surrounded by scandals since its creation and bogged down in

debts of R$65.4 billion, Oi lays bare the bankruptcy of a policy that favored the friends of

the ex-president [Lula]."

> **J)**   **After the Citibank Settlement, Mr. Dantas, Mr. Ferman, and Opportunity Face Continuing and Mounting Coercion and** ▮▮▮▮▮▮▮▮

208.   Mr. Dantas, Mr. Ferman's, and Opportunity's capitulation in releasing

Citibank and granting Citibank rights to the Highlake Proceeds did not result in the

promised cessation of hostilities.  It became almost immediately apparent that factions

within the PT regime viewed Mr. Dantas and his colleagues as a continuing threat:  they

knew too much about the regime's corrupt activities; and if they did anything to challenge or

otherwise call attention to the duress that they had faced, they could jeopardize the Supertele

deal by revealing the role of senior PT Party politicians, including President Lula and then

Chief of Staff Rousseff, in forcing Opportunity to acquiesce to the transaction in furtherance

of the regime's illicit political ends.

209.   Immediately after the execution of the Supertele transaction documents on

April 25, 2008, Brasil Telecom and Opportunity discussed steps to achieve the promised

peace by obtaining the closure of criminal and administrative proceedings.  However, Brasil

Telecom's chief legal officer indicated that there would be problems in doing so because

there were "success fees" that had been promised.  When this conversation was reported to

Mr. Dantas, he immediately understood that the reported "success fees" were payments

previously promised to authorities to arrest him.  He also realized that representatives of the

PT regime and its allies hoped to use this arrest to preclude him for doing anything to challenge the Supertele transaction and to discredit him as a witness in the pending Italian investigation, which the PT regime recognized as a threat to their power because of the wrongdoing it could expose.

210.    The day after the Supertele merger documentation was executed, *Folha de São Paulo* reported on the story previously raised with Opportunity that Mr. Dantas, Mr. Ferman, and others at Opportunity would be arrested.  Other press articles also reported that Mr. Dantas would be arrested, further prompting Mr. Dantas to try to better understand the situation and determine why a cessation of hostilities was not materializing.

211.    In or around this time, there were also other indications that the PT regime and its allies continued to pursue Mr. Dantas, his colleagues, and Opportunity. Mr. Braz became aware that he was being followed by ABIN, the state intelligence agency directed by Paulo Lacerda which reported directly to the office of the President.  Mr. Braz raised concerns with Mr. Greenhalgh, including why the hostilities were continuing. Mr. Greenhalgh reported that he had talked with Gilberto Carvalho, the Chief of Cabinet for President Lula, who said that he understood from a military general who was Mr. Lacerda's superior, General Jorge Felix, that the continued surveillance of Opportunity was supposedly a mistake and that it was surveillance being conducted of Russian spies.  General Felix has subsequently testified that the information his office received from ABIN concerning surveillance of Russian spies was "a cover story" Mr. Lacerda had presented to mislead General Felix himself.

212.    On July 8, 2008, as part of what was called Operation Satiagraha, Mr. Dantas, Mr. Ferman, and several other Opportunity executives were arrested ███████



One of the most well-respected journalists in Brazil has since written a book that painstakingly details how the bribery claims at the heart of the allegations were, in the journalist's words, a "farce."

213.     The Operation Satiagraha arrests were orchestrated to result in intense publicity, including based on confidential leaks by the Federal Police officers who were involved with ABIN in pursuing the arrests.  The resulting negative publicity in the Brazilian and international press caused grave harm to Mr. Dantas, Mr. Ferman, their businesses, and their reputation.  The charges against Mr. Dantas, Mr. Ferman, and their colleagues were also designed to preemptively taint any progress they might make in defending themselves in the courts by falsely suggesting that any such victories were the result of bribery rather than the merits.

214.    The lead Federal Police inspector assigned to Operation Satiagraha has declared that the operation was a presidential mission, a declaration consistent with the involvement of ABIN.

215.    On the day after these arrests, President Lula himself underscored the intense interest that he and the PT regime had in the pursuit of Mr. Dantas by taking time away from an official visit to Japan to call his Minister of Justice to compliment him and the Federal Police on the arrests.  On July 11, 2008, President Lula further publicly praised and congratulated the Federal Police for their work, this time while traveling on official business in East Timor.  In that July 11 statement, President Lula sent a not-so-veiled message stating, "There is only one way for people not to be harassed by the country's police:  it is to walk on the safe side."  Mr. Dantas and his colleagues understood this statement to be directed at them, with the point being that the only "safe side" for them was one where they could not be considered a threat to the PT regime.

216.



217.

Substantial damage to

Mr. Dantas, Mr. Ferman, and their personal and business reputation had already been done, however, just as those involved in the illegal arrests had orchestrated.  For his part, Mr. Braz spent significant time in prison in harsh conditions and was threatened with murder before he secured his release.

218.    Mr. Dantas had several subsequent discussions with Mr. Greenhalgh as to why the regime was still persecuting him and his colleagues.  Mr. Greenhalgh expressed his personal dismay that hostilities had continued even after Mr. Dantas had capitulated in providing the release to Citibank and in allowing Citibank to share the Highlake Proceeds. Mr. Greenhalgh was also upset that he too had been made a target in Operation Satiagraha for acting on Opportunity's behalf, even though his doing so had been in furtherance of the regime's goals.  Mr. Greenhalgh would later inform Mr. Dantas that while some in the government had indicated that Operation Satiagraha was no longer necessary, there were still private interests, like Brasil Telecom acting under the control of Citibank and its co-conspirators, that were continuing to pay authorities to pursue Operation Satiagraha.  Mr. Greenhalgh also warned that the ABIN was wiretapping Opportunity's offices.

219.    After the initial arrests and the resulting waves of negative publicity, Operation Satiagraha floundered.  The lead Federal Police inspector involved, Protógenes Queiroz, was removed from the operation and himself became the target of an investigation for inter alia having illegally used, with the blessing of Paulo Lacerda, approximately 100 ABIN agents in the operation against Mr. Dantas.  Inspector Queiroz was also investigated for his illegal efforts in pursuing Mr. Dantas, including his fraudulently manufacturing evidence and illegally leaking information about the operation.

220.    ███████████████████████████████████████████

███████████████████████████████ His immediate superior, who was unaware

of the illegal participation of ABIN, testified that the manner in which Mr. Queiroz

conducted the Satiagraha operation outside of normal Federal Police channels "looked …

like a conspiracy."

221.    With respect to the use of ABIN agents, Mr. Lacerda, the head of ABIN, with

the support of President Lula, first tried to deny ABIN's involvement████████████████

████████████████████████████████████████████████████

███████████████████████████████ Faced with this untenable

position, President Lula removed Mr. Lacerda from ABIN and appointed him to a newly

created post of police attaché at the Brazilian embassy in Portugal.

222.    Inspector Queiroz was later convicted by the Supreme Court and expelled

from the Federal Police and fled to Switzerland where he remains a fugitive.  Investigations

of Mr. Queiroz for bribery, malfeasance in public office, illegal wiretapping, ████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

223.    In addition, the Brazilian Supreme Court found that the Operation Satiagraha

arrest orders were illegal, and harshly criticized the judge that ordered the arrests for

colluding with Inspector Queiroz and the federal prosecutor and engaging in "insolent and

unusual behavior" that the most senior Supreme Court justice found to be without precedent

in "forty years of experience in the legal field, either as a Member of the São Paulo Public Prosecutors' Office or Judge of this Court."  Opportunity heard reports that former Minister of Justice Thomaz Bastos had promised this judge a nomination to the Brazilian Supreme Court for his work in targeting Mr. Dantas and his colleagues in Operation Satiagraha. Instead, the Brazilian National Justice Counsel has condemned the judge for ordering the illegal arrest. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████

224.    Despite these initial setbacks, factions in the PT regime, with the support and imprimatur of the regime's highest officials, were undeterred in keeping Mr. Dantas, Mr. Ferman, and their colleagues at Opportunity under their thumb so they would not take initiatives that put at risk the power of senior PT regime officials.  In September 2008, Carta Capital reported that efforts were underway to try to re-energize Operation Satiagraha for President Lula by having the Federal Police create "a 'superstar national soccer team' to reconstruct the investigation against Dantas and ultimately put the banker behind bars."

225.    These efforts reflected the PT regime's practice of coopting the Federal Police as a "personal instrument of pressure and intimidation, a police of a political party," as described by Romeu Tuma, who served as Secretary of National Justice from 2007-2010. Mr. Tuma has described a "Brazilian version of the German Stasi", Machiavellian in its purposes, all directed by President Lula in collaboration with then Minster of Justice Thomaz Bastos:

"It was the manner of Lula's totalitarian Federal Police to be able to set up inquiries against targets…with no judicial control…The Federal Police is the armed and indispensable tool of the power project.  They operate behind a front of legality, just as the cells and apparatuses of subversion operated clandestinely.  Order is subverted, taking advantage, in the majority of cases, of the leniency and half-hearted nature of the courts, at the first level of jurisdiction."

226.    Citibank's co-conspirators acted to exploit this environment by instigating the continuation of Operation Satiagraha based on new claims of wrongdoing by Opportunity and its executives.

227.

228.

75

████████████████████████████████████████ Opportunity's United States lawyers subsequently sent letters to the U.S. Secretary of State and Ministers of the Brazilian Supreme Court complaining about the brazen failure to respect Opportunity's attorney-client privilege.

229.    In short, by this time, the PT regime, as instigated by Citibank and others, had set in motion the full force of the power of the state against Mr. Dantas, Mr. Ferman, and Opportunity, and little beside a regime change could disrupt that effort.  There were attacks upon and attempts to intimidate judges involved in the case against Mr. Dantas and his colleagues, including members of the Supreme Court of Justice (STJ) and the Brazilian Supreme Court (STF) who presided over the legal matters.  The intimidation included wiretapping of Ministers of the Supreme Court.

230.    In 2009, Inspector Queiroz also incited an activist group that is indirectly sponsored by the PT Party to invade cattle ranches in which Mr. Dantas had investments in the State of Para, resulting in the torture and killing of two ranch employees and causing substantial damage to livestock, business, and property on the ranch.  The then-governor of Para, who was a PT Party member and a former Senator who had signed the Altered Mensalão Report, was dismissive of the harm caused to Mr. Dantas's employees, land, and business, even as scores more land invasions continued through the summer of 2016.

231.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Also in 2009, President Lula himself proclaimed that he sought to finish Operation Satiagraha before he left office and PT Party propagandists engineered a

substantial media campaign designed to try to bolster the false accusations. █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████   These circumstances reinforced Mr. Dantas' and Mr. Ferman's perception

that they could not rely on institutional protections and, to the contrary, the PT regime stood

ready to take draconian action if Mr. Dantas, Mr. Ferman, and their colleagues did anything

that was perceived to threaten its hold and power and its corrupt ways of governing.  In

these circumstances, for Mr. Dantas, Mr. Ferman, and Opportunity to bring claims targeting

the coercion that occurred in the Supertele transaction would have been perceived as a

substantial provocation leading almost certainly to further retaliation against them.

Accordingly, Mr. Dantas, Mr. Ferman, and Opportunity were compelled not to bring such

claims.

232.   ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████   Mr. Greenhalgh also made clear to Mr. Dantas that

Opportunity still needed to refrain from taking any initiatives that could be politically used against President Lula and President Dilma. Mr. Dantas heard similar warnings from Guilherme Sodré, who confirmed, after President Rousseff took power, that there were still powerful PT regime officials such as Ms. Salvati that were prepared to destroy him if necessary.

233.    Mr. Dantas also discussed with Mr. Greenhalgh a conversation that had occurred with the sister of Monica Goes, a lawyer who had represented Citibank and the Pension Fund's interests in litigation in the Brazilian courts regarding control of Brasil Telecom. The sister reported that both a first instance judge and a minister of the STJ involved in this litigation had been bribed to rule against Opportunity. Afterwards, the sister died, reportedly in a suicide. Mr. Greenhalgh told Mr. Dantas he should just forget about these facts because there appeared to be maneuvers to arrest him again if he raised these issues. Mr. Dantas subsequently met with a lawyer for Pension Funds' representatives at Angra Partners to provide assurances that he would not disclose any of these facts.

234.    These kinds of threats and warnings did not abate. ██████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ The retaliation was immediate. At the time, a magazine article appeared intending to smear Mr. Dantas based on a new investigation regarding Mr. Dantas's supposed involvement in the Mensalão scandal. ████████████████████████████ ██████████████████ Then, in October 2012, the President of the

Supreme Court, a judge known to be close to President Lula and his family, similarly

renewed false accusations regarding Mr. Dantas's role in the Mensalão scandal in a speech

that Mr. Dantas understood as a further confirmation of the extreme risk he faced if he acted

in ways that the state viewed as a threat.

235.    In ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

236.    The following year, Mr. Greenhalgh came forward with a new warning that

the PT Party-aligned activist group that had violently invaded Mr. Dantas's ranch in 2009

would again invade the property and instigate conflict with ranch employees and their

families in the hopes that, if a death resulted, it would be used as pretext to justify arresting

and bringing new criminal charges against Mr. Dantas, as if he had instructed his employees

to kill people.

237.    During this period, from August 2012 until March 2014, criminal cases

against senior politicians resulting from the Mensalão scandal were pending before the

Brazilian Supreme Court and the political environment was extremely sensitive.  The Chief

of Staff and the President of the PT Party were both sent to jail and there were many

questions regarding whether President Lula himself was involved.  In this tinderbox

environment, Mr. Dantas and Mr. Ferman recognized that, as they had been warned, any

action taken by them that raised issues of political corruption in the Supertele transaction

would be met with particular fierceness.

238.     In addition, throughout this period, former Minister of Justice Thomaz Bastos repeatedly warned Mr. Dantas and his colleagues that they should not instigate the government in the course of their defense against the Operation Satiagraha charges.  In 2011, Mr. Dantas's sister and colleague, Veronica, was called to see Mr. Thomaz Bastos. He advised her that Opportunity should only make narrow, "technical" arguments that they had not committed the crimes of which they were accused, and emphasized Opportunity should act in accordance with what was best for the Brazilian state.Ms. Dantas recognized that Opportunity needed to avoid creating friction and would face further reprisals if Mr. Dantas, Mr. Ferman, and Opportunity defended themselves in ways that would expose underlying corruption by members of the political regime and their allies in the government and the business community.  Mr. Thomaz Bastos also met with another of Mr. Dantas's colleagues, Carlos Rodenburg, to similarly send the message that Opportunity should just focus on a technical legal defense and not make noise by raising the moral issues that would be implicated by telling the details of the corruption.

239.     One of the times that Mr. Thomaz Bastos made this warning occurred after ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████     In response, Mr. Thomaz Bastos asked Mr. Rodenburg to meet him at his law firm.  He again sent the message that Opportunity should focus its defense on narrow legal arguments and avoid moral arguments of corruption that could put the regime at risk. Notably, Mr. Thomaz Bastos's advice came in a context where Mr. Dantas and others at Opportunity were trying to defend themselves against criminal charges that carried with

them serious prison terms.  Mr. Dantas and Mr. Ferman well understood that the regime

would have even less tolerance, and the reprisals would be all the more serious, if

Opportunity were to put at issue the regime's corrupt methods in new, affirmative civil

litigation publicly challenging the coercive measures that resulted in the Supertele

transaction.

240.    In May 2015, Opportunity received what was described as a "message from

the government" warning that it should not commence an action against Citibank such as

this litigation.  Opportunity was told that any such action would involve critical political

issues and there was a special concern with the publicity of United States litigation, the

breadth of the United States discovery process, the possibility U.S. law enforcement

authorities might become involved, and the risks that would cause for the PT regime.

241.    In addition to these direct warnings to Mr. Dantas, new public information

reinforced what Opportunity had come to learn regarding the PT regime's domination of the

Brazilian state and the extreme lengths it was prepared to go to further its illicit political

purposes including by manipulating and intimidating the judiciary.  For example, in 2012,

Supreme Court Justice Joaquim Barbosa presided over a criminal case that resulted in

convictions of numerous elected officials and cabinet members based on their involvement

in the Mensalão scandal.  He subsequently retired before his term was over, citing threats

against him for convicting these PT officials.  The Brazilian press has reported that another

Supreme Court Justice was appointed because he committed to vote to acquit PT officials

charged in the Mensalão case.

242.    More recently, as part of the now notorious "Operation Car Wash"

investigation into massive corruption at the state owned oil company Petrobrás, Senator

Amaral, the former PT Party leader in the Senate responsible for the Altered Mensalão

Report, has confessed in a plea bargain to the efforts by the regime, working with former

Minister of Justice Thomaz Bastos, to appoint a justice who would take steps to terminate

the Car Wash investigation.  The judge responsible for Operation Car Wash was himself

threatened by President Lula and this justice's communications were monitored by ABIN.

243.    As of today, Presidents Lula and Rousseff, two former PT Ministers of

Finance, two former PT Chiefs of Staff, and the former PT leader in the Senate, among

many other politicians from the PT Party and other parties, are all being investigated for

corruption, obstructing justice, and other related wrongdoing under the auspices of a

courageous judge, even as he employs bodyguards to ensure his safety.  These investigations

have confirmed just how deeply the corruption within the Brazilian state tainted those

individuals and groups that Citibank relied on, and allied with, in their dealings with Mr.

Dantas, Mr. Ferman, and Opportunity.  For example, the PT representatives of the Pension

Funds who negotiated the Citibank Put with Citibank are now under investigation in Brazil

for corruptly using their positions in furtherance of the interests of the PT regime and its

allies rather than the pensioners who they were charged with representing.  And one of the

Pension Fund's lead criminal lawyers, Ary Bergher, is now under investigation for his

involvement in a wrongful scheme that has resulted in the arrest of the the former governor

of Rio de Janeiro and his wife in Operation Car Wash.

244.    In all, the scope of Operation Car Wash leaves no question that the PT regime

and its allies were engaged in systematized corruption, including at its highest levels, and

that, as Mr. Dantas was informed, the regime would willingly, and improperly, use the full

force of the Brazilian state to pursue its illicit goals and keep Mr. Dantas, Mr. Ferman, and

Opportunity silent with respect to the wrongdoing that had occurred in the Supertele transaction.

245.    First, they knew that the stakes for the PT regime and its allies were enormously high.  For years, Mr. Dantas had been informed of the regime's illicit activities to further its political goals and the private interests of its allies.  And he recognized that PT Party officials believed that exposure of such corruption in a U.S. lawsuit posed an existential threat to the party, its allies, and their corrupt way of doing politics in Brazil. Indeed, the recent public revelation of such corruption through Operation Car Wash has in fact contributed to bringing down the government and leaving the PT Party and its coalition partners drastically weakened.  The threat to the State that litigation by Mr. Dantas, Mr. Ferman, and Opportunity against Citibank posed in this regard was particularly acute, because it raised the possibility that foreign law enforcement could be triggered to investigate political corruption in Brazil.  Opportunity's counterclaims in the New York litigation had already raised these concerns, as had Mr. Dantas's involvement in the Italian investigation of Telecom Italia's conduct in Brazil.  A lawsuit targeting corruption involving Citibank, the PT regime, and its allies in the Supertele transaction would exacerbate the kinds of issues that the regime had worked so hard to eliminate through its prior attacks on Mr. Dantas and his associates.

246.    Second, the Supertele transaction implicated both Presidents Lula and Dilma. President Lula, among other things, was personally responsible for satisfying Andrade Gutierrez's desires by changing the law to permit Oi to acquire Brasil Telecom.  President Rousseff, in her then role as Chief of Staff, had, among other conduct, overseen the

Supertele deal that included the compelled releases and the compelled sharing of Highlake Proceeds with Citibank.

247.     Third, the PT regime's willingness to use the power of the state against Mr. Dantas and his colleagues when threatened was no mere hypothetical. ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ Indeed, not only had politically-connected individuals like Mr. Greenhalgh warned Mr. Dantas not to challenge the Presidents Lula and Dilma, President Lula was also on record indicating that Mr. Dantas needed to "walk on the safe side" and 100 ABIN agents were used in Operation Satiagraha to implement what the Federal Police officer in charge and an ABIN agent called a "Presidential mission" to persecute Mr. Dantas and his colleagues.

248.     Mr. Dantas, Mr. Ferman, and their colleagues recognized that in defending themselves against any further manufactured allegations they would necessarily be forced to demonstrate the culpability of those in power who were responsible for the false charges. The inevitable and expected result would be a cycle of further retaliation as those in the PT regime who were threatened by their defense would seek to further undermine them with new false accusations, just as had occurred in the past.  And the risks to Mr. Dantas, Mr. Ferman, and Opportunity were all the more acute because of the PT regime's pervasive influence in the courts, including through former Minister of Justice Thomaz Bastos who

had a demonstrated pattern of interfering with the judiciary, many of whom owed their appointments to him.

249.    Fourth, Mr. Dantas understood—and, increasingly, the public record has come to confirm with additional revelations almost daily—that the PT regime and its allies had the ready ability to, and did, manipulate the judiciary, police, prosecutors, and the press so that he and his colleagues could not count on their innocence of the Mensalão, Operation Jackal, Operation Satiagraha, or any other manufactured charges as a basis to ensure their acquittal.

250.    Finally, on several occasions, Opportunity received inquiries regarding its progress in preparing and pursuing the very claims in the instant action—months before the case was filed.  These inquiries made clear that the confidentiality of Opportunity's privileged communications had been breached by adversaries who were seeking to use the improperly obtained information to subject Opportunity to further intimidation.  For example,

- In April 2015, a journalist in Brazil emailed Opportunity to confirm whether Opportunity's chief legal officer had met with David Boies in New York because Mr. Dantas was preparing a lawsuit against Citibank related to Citibank's involvement in Petrobrás's overpriced acquisition of the Pasadena refinery.

- In July 2015, Mr. Boies received an email from a journalism teacher at the University of São Paulo stating that "An old source, in whole deep background, has told me that Daniel Dantas' Opportunity group used their lawyer, mrs. Danielle SilberGleid, to reach/ hire your law services in the

Usa.  According to this source, Dantas do want your law services to sue Citigroup - which, source said, includes investigating illicit activities by Citi."

- In January 2016, a *Globo* journalist published a note claiming that it had a source it would not reveal indicating that Mr. Dantas had instructed a New York firm to pursue claims in New York.

251.    The concerted efforts of Defendants, the PT Regime, and its political allies to harass, intimidate and discredit Mr. Dantas, Mr. Ferman, and Opportunity had the apparent purpose, and the actual effect, of instilling fear in Mr. Dantas, Mr. Ferman, and Opportunity that if they took steps that brought to light corruption by the most senior PT leaders like Presidents Lula and Dilma and former Minister Thomaz Bastos in a public litigation in the United States with broad discovery rights, they would face additional catastrophic attacks threatening them, their families, Opportunity's employees, and Opportunity's reputation and business.

252.    In these circumstances, Mr. Dantas, Mr. Ferman, and Opportunity had no alternative but to forestall bringing the claims asserted herein until the ongoing duress diminished.

**K)     The Duress Abates, Allowing Mr.  Dantas, Mr. Ferman, and Opportunity to Pursue the Instant Claims**

253.    Only recently has the continuing duress described above abated sufficiently such that Mr. Dantas, Mr. Ferman, and Opportunity can now bring this action, although not without trepidation.

254.    First, Ms. Rousseff, who personally oversaw the creation of the Supertele transaction that included the releases to Citibank and the sharing with Citibank of the

Highlake Proceeds has been removed as President reducing the PT Party's ability to control the powers of the state.  Her former Vice President, Michel Temer, who is not a member of the PT Party, has now assumed the powers of the presidency, thus substantially diminishing the risk that Mr. Dantas, Mr. Ferman, and Opportunity will face retribution from the PT regime.

255.    While numerous PT regime appointees remain within the apparatus of the Brazilian state today and could illicitly use their continued powers to cause Mr. Dantas, Mr. Ferman, and Opportunity harm, Ms. Rousseff's removal and the resulting drop in the PT Party's public support has significantly reduced the risk that Mr. Dantas, Mr. Ferman, and Opportunity will be targeted in furtherance of the PT regime's and its allies' improper goals.

256.    In all, there has been a dramatic loss of power for key figures in the PT regime: former President Lula has been indicted multiple times; former President Dilma is under investigation; former Minister Thomaz Bastos has died; former Secretary of Communication and effective authority over the Pension Funds Gushiken has died; former Chief of Staff Dirceu was convicted in both the Mensalão scandal and in Operation Car Wash and is in jail; former Minister Palloci was also arrested in Operation Car Wash and is in jail; former Senator Delcidio do Amaral was arrested and agreed to a plea bargain in Operation Car Wash; Mr. Lacerda has been removed from his positions in law enforcement; the representatives of the Pension Funds are under investigation; scores of PT Party members in Congress and their allies are also under investigation or arrested; and the police inspector responsible for Operation Satigraha has been convicted by the Supreme Court, expelled from the police, and is a fugitive in Switzerland.

257.    Moreover, President Temer announced, among other immediate reforms, that the government would cut off the funding for the propaganda machine utilized by the PT regime and that he will propose reforms to depoliticize the Pension Funds.

258.    Second, Operation Car Wash and other recent investigations has made public the illicit motivations and corrupt model of governing used by the PT regime and other political parties to maintain and expand its power.

259.    As a Minister of the Supreme Court wrote in a September 2015 opinion concerning how the "criminal scheme revealed by Operation Car Wash" had "proved to the country that the ruling party" had "raised sufficient sums to finance campaigns until 2038" which made "it virtually impossible to alter power."

> "The scheme has taken shape as a veritable method of governance: on one side, resources of the state are flowing to the political powers that be; on the other, they are financing political and partisan activity and election campaigns, corrupting public officials, maintaining the partisan structure and base, buying off the support of the press and of social movements and, of course, paying for the luxuries of the figures involved.  That is, one was dealing with a criminal method of governance, which sought the perpetuation of a party in power via asphyxiation of the opposition..."

260.    The revelations over the past year from the Operation Car Wash and other investigations mean that Mr. Dantas's, Mr. Ferman's, and Opportunity's allegations can no longer be viewed as events that could cause the downfall of the Brazilian political system and expose the illicit methods used to raise money and maintain the regime in power. Notably, the corruption uncovered in connection with Operation Car Wash has already triggered investigations by international law enforcement agencies:  for example, in December 2016 the United States Department of Justice and prosecutors in Switzerland announced guilty pleas resolving criminal charges against the Odebrecht construction firm and Braskem S.A., a Brazilian petrochemical company, in what has been characterized as

the largest foreign bribery case in history.  Thus, completely independent of anything Mr.

Dantas, Mr. Ferman, and Opportunity have done or could do, foreign prosecutors have

already focused their attention on the widespread wrongdoing in Brazil.  Accordingly, here

too, Mr. Dantas, Mr. Ferman, and Opportunity have much less reason to fear that they will

be held responsible if they file claims that include allegations of political corruption by

senior PT figures in Brazil that further interest foreign law enforcement agencies.

261.    Third, only recently have Mr. Dantas and Mr. Ferman finally been able to

resolve, in their favor, the false charges against them in Operation Satiagraha and Operation

Jackal.

262.    ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

263.    Separately, on June 7, 2011, the STJ granted Mr. Dantas's request for habeas

corpus relief in connection with Operation Satiagraha and declared null and void all

evidence on which that operation was based.  The opinion of the STJ recognized the "large

quantity of proofs" that confirmed the "improper and patently illegal participation of ABIN"

in the operation.  The opinion further characterized the operation as a "plot" that amounted

to a "personal quarrel to incriminate a certain person" using methods that "exceeded all

limits."

264.    ████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

265.    After the June 7, 2011, habeas corpus decision, there was lengthy litigation about whether this decision required dismissal of the alleged financial crime charges against Mr. Dantas and Mr. Ferman made in connection with Operation Satiagraha.  [REDACTED]

[REDACTED]

[REDACTED]

266.    [REDACTED]

[REDACTED]

[REDACTED]  have significantly decreased the ability of the PT regime and its allies to cause them harm, thereby further freeing them and Opportunity to pursue claims against Citibank.

### FIRST CLAIM FOR RELIEF (Duress – Brazilian Law)

267.    Plaintiffs repeat and reallege paragraphs 1 to 266 as if fully set forth herein.

268.    On April 25, 2008, Mr. Dantas, Mr. Ferman, and certain other Plaintiffs (collectively the "Signatory Plaintiffs") executed the Citibank Settlement.  The Signatory Plaintiffs included Mr. Dantas, Mr. Ferman, Opportunity Fund, and Banco Opportunity S.A. now known as Opportunity HDF Participações S.A.

269.    At the time, Mr. Dantas, Mr. Ferman, and Opportunity had been unlawfully threatened by Citibank, PT representatives in the management of the Pension Funds, their representatives in the management of Brasil Telecom, Telemar and factions of the Brazilian government and its allies that the full powers of the Brazilian state would be misused against them and that they would be subjected to a risk of illegal arrest, illegal imprisonment,

dishonor, scandal, and damage to property or person if Mr. Dantas, Mr. Ferman, and Opportunity did not provide Citibank with the Release and Covenant and grant Citibank a portion of the Highlake Proceeds.

270.    These threats, which have only just abated, were unlawful, abusive, and not the consequence of the regular exercise of any right and intended to obtain undue advantage for those who made them.

271.    As a result of these severe and illegal threats, Mr. Dantas and Mr. Ferman had a well-founded fear of harm to their person and property.  Such illegal threats were the determinative motive for Mr. Dantas and Mr. Ferman to execute the Citibank Settlement personally and agree to release claims against Citibank and grant Citibank a portion of the Highlake Proceeds.  Such illegal threats were also the determinative motive for the execution of the Citibank Settlement, and the granting of a portion of the Highlake Proceeds and releases to Citibank, by the Signatory Plaintiffs given Mr. Dantas's and Mr. Ferman's role with respect to those legal entities.

272.    Defendants participated in, requested, facilitated, knew of, consented to, and/or were capable of knowing through the exercise of normal care under the circumstances of these threats.  Further, Defendants had clear prior knowledge of the methods used by PT representatives of the Pension Funds and the PT regime and its allies in making the kinds of threats that Plaintiffs faced, further evidencing their understanding, knowledge, and ability to learn of these threats.

273.    Defendants knowingly took advantage of the benefits they obtained when the Signatory Plaintiffs, under duress, executed the Citibank Settlement.

274. Mr. Dantas, Mr. Ferman, and the Signatory Plaintiffs had no alternative but to execute the Citibank Settlement in light of the illegal threats that Mr. Dantas, Mr. Ferman, and Opportunity faced.  Their fear was justified in light of the nature of the threats, the circumstances surrounding those threats, and the history of conduct by Defendants and by the others who were involved in causing and making the threats.

275. The Citibank Settlement contains not only a Release that forecloses the Signatory Plaintiffs from pursuing claims against Citibank but also includes a Covenant not to sue that requires the Signatory Plaintiffs to cause their affiliates not to pursue such claims–claims Opportunity was already preparing to bring.

276. As a result of the duress, both the Signatory Plaintiffs and non-Signatory Plaintiffs released, were unable to bring, and refrained from bringing, valuable claims they otherwise would have pursued.

277. Plaintiffs have suffered both actual damages, lost profits, and the loss of chance to pursue valuable claims against Defendants, including because they were required to release claims against Citibank they otherwise would have pursued that were worth billions of dollars.

278. All Plaintiffs have been damaged by the duress that resulted in the Citibank Settlement.  Plaintiffs are entitled to damages in an amount to be determined at trial. Defendants are jointly and severally liable for all damage caused to Plaintiffs.

**SECOND CLAIM FOR RELIEF (Duress – New York Law)[11]**

279. Plaintiffs repeat and reallege paragraphs 1 to 278 as if fully set forth herein.

---

[11] Plaintiffs plead this cause of action in the alternative to the extent Brazilian law does not apply.

280.    On April 25, 2008, Mr. Dantas, Mr. Ferman, and the other Signatory Plaintiffs executed the Citibank Settlement.

281.    At the time, Mr. Dantas, Mr. Ferman, and Opportunity had been unlawfully threatened by Citibank, PT representatives in the management of the Pension Funds, their representatives in the management of Brasil Telecom, Telemar and factions of the Brazilian government and its allies that the full powers of the Brazilian state would be misused against him and that he would be subjected to a risk of illegal arrest, illegal imprisonment, dishonor, scandal, and damage to property or person if Mr. Dantas, Mr. Ferman, and Opportunity did not provide Citibank with the Release and Covenant and grant Citibank a portion of the Highlake Proceeds.

282.    These threats, which have only just abated, were unlawful and not the consequence of the regular exercise of any right.

283.    The coercion exerted against Mr. Dantas and Mr. Ferman also constituted coercion against each of the entities that were Signatory Plaintiffs given Mr. Dantas's and Mr. Ferman's role with respect to those legal entities.

284.    Defendants participated in, requested, facilitated, knew of, consented to, and/or were capable of knowing through the exercise of normal care under the circumstances of these threats.  Further, Defendants had clear prior knowledge of the methods used by PT representatives of the Pension Funds and the PT regime and its allies in making the kinds of threats that Plaintiffs faced further evidencing their understanding, knowledge, and ability to learn of these threats.

285.    Defendants knowingly took advantage of the benefits they obtained when the Signatory Plaintiffs, under duress, executed the Citibank Settlement.

286.    Mr. Dantas, Mr. Ferman, and the Signatory Plaintiffs had no alternative but to execute the Citibank Settlement involuntarily in light of the illegal threats that Mr. Dantas, Mr. Ferman, and Opportunity faced.  Their fear was justified in light of the nature of the threats, the circumstances surrounding those threats, and the history of conduct by Defendants and by the others who were involved in causing and making the threats. Such illegal threats were the determinative motives for the involuntary execution of the Citibank Settlement, the involuntary release of claims against Citibank, and the involuntary grant to Citibank a portion of the Highlake Proceeds.

287.    The Citibank Settlement contains not only a Release that forecloses the Signatory Plaintiffs from pursuing claims against Citibank but also includes a Covenant not to sue that requires the Signatory Plaintiffs to cause their affiliates not to pursue such claims–claims Opportunity was already preparing to bring.

288.    As a result of the duress, both the Signatory Plaintiffs and the non-signatory Plaintiffs suffered damages in entering into the Citibank Settlement, including because they were required to release claims against Citibank they otherwise would have pursued that were worth billions of dollars.

289.    All Plaintiffs have been damaged by the duress that resulted in the Citibank Settlement.  Plaintiffs are entitled to damages in an amount to be determined at trial. Defendants are jointly and severally liable for all damage caused to Plaintiffs.

290.    Plaintiffs are entitled to punitive damages because of the gross, wanton, willfully fraudulent, and morally culpable conduct of the Defendants.

**THIRD CLAIM FOR RELIEF (Malicious Prosecution – New York Law)**

**(By Mr. Dantas against All Defendants)**

291.    Plaintiffs repeat and reallege paragraphs 1 to 290 as if fully set forth herein.

94



297.



298. ████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

299.   As set forth above, ████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

300. ████████████████████████████████████████

████████████████████████████████████████████

████

301. ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

302.    The malicious prosecution caused by Defendants resulted in substantial

damages to Mr. Dantas and his businesses.  Mr. Dantas suffered special damages including,

but not limited to:   (i) the harm caused by his imprisonment; (ii) the harm caused as a result

of the freezing of his assets and the assets of Opportunity companies in which he has

interest;  (iii) the harm caused when the Opportunity entities in which he has an interest

experienced substantial redemptions and client losses days after his arrest in Operation

Satiagraha; and (iv) the lost opportunities for Mr. Dantas and Opportunity to manage other investments for existing and prospective clients develop his business, and make profitable new investments given the reputational impact of the malicious prosecution.

303.    Mr. Dantas is entitled to recover all such special damages and, because the malicious prosecution caused by Defendants and their co-conspirators was criminal, also general damages in an amount to be determined at trial.  Defendants are jointly and severally liable for all damage caused to Plaintiffs.

304.    Plaintiffs are entitled to punitive damages because of the gross, wanton, willfully fraudulent, and morally culpable conduct of the Defendants.

## FOURTH CLAIM FOR RELIEF (Conspiracy to Engage in Malicious Prosecution – New York Law)

### (By Mr. Dantas against All Defendants)

305.    Plaintiffs repeat and reallege paragraphs 1 to 304 as if fully set forth herein.

306.



307.

308.

309.

310.    The malicious prosecution caused by Defendants resulted in substantial damages to Mr. Dantas and his businesses.  Mr. Dantas suffered special damages including, but not limited to:   (i) the harm caused by his imprisonment; (ii) the harm caused as a result of the freezing of his assets and the assets of Opportunity companies in which he has interest;  (iii) the harm caused when the Opportunity entities in which he has an interest experienced substantial redemptions and client losses days after his arrest in Operation Satiagraha; and (iv) the lost opportunities for Mr. Dantas and Opportunity to manage other investments for existing and prospective clients develop his business, and make profitable new investments given the reputational impact of the malicious prosecution.

311.    Mr. Dantas is entitled to recover all such special damages and, because the malicious prosecution caused by Defendants and their co-conspirators was criminal, also general damages in an amount to be determined at trial.  Defendants are jointly and severally liable for all damage caused to Plaintiffs.

312.    Plaintiffs are entitled to punitive damages because of the gross, wanton, willfully fraudulent, and morally culpable conduct of the Defendants.

## **Jury Demand**

Plaintiffs demand a trial by jury.

**Prayer for Relief**

WHEREFORE, Plaintiffs request that the Court enter an Order:

1.       Awarding damages in favor of the Plaintiffs against all Defendants, jointly

and severally, in an amount to be determined at trial;

2.       Such other and further relief as is deemed just and proper.

Dated: New York, New York
        February 17, 2017

                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP


                                By:          /s/ Philip Korologos
                                        David Boies (dboies@bsfllp.com)
                                        Philip Korologos (pkorologos@bsfllp.com)
                                        Eric Brenner (ebrenner@bsfllp.com)
                                        BOIES, SCHILLER & FLEXNER LLP
                                        575 Lexington Avenue
                                        New York, New York 10022
                                        Phone: (212) 446-2300

                                        *Attorneys for Plaintiffs*