UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UBDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/18/18_

---

DANIEL VALENTE DANTAS, et al.

                                  Plaintiffs,

         -against-

CITIBANK, N.A., et al.

                               Defendants.

---

                               17-Cv-1257 (SHS)

                               OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

      This is a dispute over a decade-old settlement agreement that ended a lengthy civil litigation in the Southern District of New York, as well as the legitimacy of a related Brazilian prosecution. Plaintiffs are two Brazilian citizens – founders of a group of financial and banking entities known as "Opportunity" or the "Opportunity family of companies" – along with various entities that are related to the Opportunity family of companies.[1] (Compl. at 1 n. 1, ¶¶ 35-49.) Defendants are Citibank, N.A. and several of its affiliates or subsidiaries.[2] (*Id.* ¶¶ 50-55.) All plaintiffs allege that a 2008 settlement agreement between Opportunity and Citibank – which put an end to litigation then pending in the Southern District of New York – was obtained through duress by Citibank, and that plaintiffs are therefore entitled to damages. One of the plaintiffs – Daniel Valente Dantas – also alleges

---

[1] "Opportunity" refers to all or a subset of plaintiffs in this action. The distinction is immaterial for purposes of this opinion.

[2] "Citibank" refers to all or a subset of defendants in this action. The distinction is immaterial for purposes of this opinion.

that Citibank's actions triggered his prosecution for financial crimes in Brazil that he did not in actuality commit.

Defendants have now moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and plaintiffs have moved for leave to amend their complaint to include additional factual allegations. Because plaintiffs released all of their claims a decade ago in settling the S.D.N.Y. litigation, defendants' motion to dismiss the complaint is granted. For the same reason, plaintiffs' motion for leave to amend the complaint is denied as futile.

## I.   BACKGROUND

For purposes of deciding defendants' motion to dismiss, the Court assumes the truth of the factual allegations in plaintiffs' complaint. *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). In addition to the complaint's factual allegations, a court deciding a motion pursuant to Rule 12(b)(6) may also rely on the documents that are "integral to the complaint," as well as any documents incorporated into the complaint by reference. *Nicosia v. Amazon, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

Interestingly, plaintiffs have failed to attach the 2008 settlement agreement to their complaint even though it is integral, even central, to this proceeding and the complaint references the settlement agreement multiple times, quoting from and paraphrasing the specific release provision upon which defendants rely. (Compl. ¶¶ 199-202, 268, 271.) Moreover, plaintiffs' duress claims are dependent on the agreement's existence and effect. Defendants have attached the settlement agreement to their motion to dismiss the complaint and the Court has utilized its terms in deciding this matter.

In the late 1990s, Daniel Valente Dantas – the founder of Opportunity – established a joint venture aimed at obtaining control positions in Brazilian companies in Brazil's infrastructure sector. (Compl. ¶ 6, 35.) Citibank invested in this joint venture through an "offshore fund." (*Id.* ¶ 8.) Other participants included a group of Brazilian government pension funds that invested through an "onshore fund." (*Id.* ¶¶ 6, 8.) Various entities and people affiliated with Dantas invested through a final group of funds, known as the "Opportunity funds." (*Id.* ¶ 57.)

Trouble began to brew when the Brazilian onshore pension fund investors turned against Opportunity and Dantas, and instead allied themselves with certain other companies that had invested alongside the joint venture in the telecommunications market. (Compl. ¶¶ 60-64.) These other companies, the pension fund managers, and their Brazilian government allies began working together to discredit Opportunity and Dantas for their own gain. (*Id.* ¶ 64.) In 2002, when President Lula da Silva was elected and the political party PT came to power in Brazil, the efforts to discredit Opportunity escalated. (*Id.* ¶ 65.)

PT leadership figures in the Brazilian government "hated" Dantas, and worked to remove him as manager of the joint venture's onshore fund. (*Id.* ¶¶ 74-75.)

At first, Citibank sided with Opportunity in these disputes, promising to help Dantas and Opportunity recover the damages they were suffering. (Compl. ¶¶ 76-78). This changed around 2004. (*Id.* ¶¶ 81, 84, 92-94.) Around that time, Brasil Telecom (a large Brazilian telecommunications company in which the joint venture had invested) hired the private investigation firm Kroll at Citibank's suggestion. (*Id.* ¶¶ 59, 84.) Kroll was hired to look into the potential wrongdoing of another telecommunications company – one that was allied with PT and the pension funds against Opportunity, and which had also invested in Brasil Telecom alongside the joint venture. (*Id.* ¶¶ 59-65, 79, 84.) However, the company in question learned about Kroll's investigation, and was able to obtain and doctor Kroll's report so that it falsely claimed that Dantas was in charge of a Kroll investigation of Brazilian government corruption. (*Id.* ¶¶ 84-85.)

This prompted the Brazilian government to manufacture false criminal charges against Dantas. (*Id.* ¶ 86). Citibank, under new leadership and wishing to avoid scandal, switched sides. (*Id.* ¶¶ 81, 90-93.) By 2005, Citibank and the onshore pension funds made an agreement to share control of the companies in which the joint venture had invested, and to exclude Opportunity. (*Id.* ¶ 96.) In particular, Citibank agreed to ensure that Opportunity was removed as general partner of the joint venture's offshore fund. (*Id.* ¶ 97.) Consistent with this promise, in March 2005 Citibank initiated litigation in the Southern District of New York, accusing Opportunity and Dantas of breaching their fiduciary duties. (*Id.* ¶ 100; *see also* Complaint, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, No. 05 Civ. 2745 (S.D.N.Y.), Ex. D to Decl. of Carmine D. Boccuzzi dated Apr. 26, 2017.)[3] Opportunity responded with counterclaims alleging that it was actually Citibank that had breached its fiduciary duties. (Compl. ¶ 102.)

While this litigation was pending in New York, Opportunity and Dantas were facing problems in Brazil. In 2006, according to the complaint, Citibank worked with PT members, the pension funds, and their allies at a company called Brasil Telecom to ensure that a report regarding a Brazilian congressional investigation would falsely accuse Dantas of

---

[3] The Court may consider the cited complaint in deciding this motion to dismiss because the Court is permitted to take judicial notice of pleadings in other litigation related to this action. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (noting that when considering a motion to dismiss pursuant to Rule 12(b)(6), a court may consider both facts stated in the complaint and "matters of which judicial notice may be taken . . ." and that "courts routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted . . . but rather to establish the fact of such litigation and related filings"); *Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (taking judicial notice of a complaint filed in another action as a public record).

significant wrongdoing. (*Id.* ¶¶ 112-126.) As altered by Citibank and its allies, the report both recommended indicting Dantas and covered up Citibank's suspicious activities. (*Id.* ¶ 127.)

By this time, PT and its allies had come to see Dantas and Opportunity as an existential threat, believing that Dantas and Opportunity would expose corruption throughout the PT party and Brazilian government. (*Id.* ¶¶ 140-142, 156-60.) Opportunity also angered PT and its allies by standing in the way of a merger between Brasil Telecom (a company in which the joint venture was invested) and Oi, another large telecommunications company. (*Id.* ¶¶ 148-150, 162-163, 167.) This merger would significantly benefit a major PT contributor. (*Id.* ¶ 148.) For various reasons, the deal could not go through until Opportunity agreed to sell its stake in Brasil Telecom for a specific price, and to give up its litany of claims against both the Brazilian pension funds and Citibank. (*Id.* ¶¶ 164-174.)

Dantas and Opportunity were under significant pressure to agree to this arrangement. Due to conversations with PT members and Brazilian government figures, comments made by Citibank's lead negotiator in the merger deal, and various other implicit and explicit threats, Dantas believed that if Opportunity did not agree to the terms that would permit the Brasil Telecom merger to proceed, the consequence would be the destruction of his business and the loss of his own liberty through false arrest and prosecution. (*Id.* ¶¶ 154-158, 161, 163, 168, 173-177, 180-198.) Due to this pressure, believing there was no other choice, in April 2008 Opportunity signed the settlement agreement that ended the litigation Citibank had filed in the Southern District of New York. (*Id.* ¶ 104.) The settlement agreement contained a mutual release from liability for both Opportunity and Citibank, and granted Citibank rights in certain proceeds (the "Highlake proceeds") that it demanded as part of the deal. (*Id.* ¶¶ 198-201; *see also* Comprehensive Settlement and Release Agreement dated Apr. 25, 2008 ("Settlement Agreement"), attached as Ex. A to Decl. of Carmine D. Boccuzzi dated Apr. 26, 2017).

Despite Opportunity's capitulation to the pressure put upon it, Dantas was nevertheless arrested by the Brazilian authorities based on false accusations of bribery and money laundering a few months after the settlement agreement was executed. (*Id.* ¶¶ 208-212.) The investigation that led to this arrest was at least partially based on the false accusations that Citibank and its allies had placed in a congressional report recommending that Dantas be indicted. (*Id.* ¶ 297.) When efforts to prosecute Dantas flagged after his arrest, fresh accusations from allies of Citibank and PT at Brasil Telecom resulted in the continuation of those efforts. (*Id.* ¶ 219-227.)

Eventually, the charges against Dantas were all dismissed and Brazilian courts criticized his illegal arrest. (*Id.* ¶¶ 212, 217, 223.) However, Dantas continued to receive warnings that he should not take any action that would expose the wrongdoing of the PT

4

government or its allies for years after his arrest. (*Id*. ¶¶ 232-240, 251.) Only once the PT party began losing power in Brazil through the international exposure of its corrupt practices and the removal of President Dilma Rousseff from office did Opportunity and Dantas believe they could safely bring this litigation. (*Id*. ¶¶ 251-260.)

Based on these alleged facts – set forth in considerably more detail in plaintiffs' prolix 100-page, 312-paragraph complaint – plaintiffs assert four causes of action against Citibank.

All plaintiffs assert two claims of duress against all defendants: one under Brazilian law and one (in the alternative) under New York law. (*Id*. ¶¶ 267-290.) Plaintiffs allege that threats from Citibank and its allies were the reason that Dantas and Opportunity agreed to release claims against Citibank and give up some of the Highlake proceeds in the Settlement Agreement, and that all plaintiffs were damaged by those decisions. (*Id*. ¶¶ 271, 276-278, 288-290.) Plaintiffs seek money damages for the alleged duress. (*Id*. ¶¶ 278, 289-290.)

In addition, Dantas asserts one claim of malicious prosecution and one claim of conspiracy to engage in malicious prosecution against all defendants stemming from his arrest and prosecution for financial crimes he did not commit. (*Id*. ¶¶ 291-312.) He also seeks money damages as a result. (*Id*. ¶¶ 302-304, 310-312.)

## II. LEGAL STANDARD

As noted above, Citibank has now moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, a court must "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While facts alleged in the complaint must be accepted as true, factual allegations are distinguished from "conclusory allegations or legal conclusions masquerading as factual conclusions," which courts are "not . . . bound to accept." *Faber*, 648 F.3d at 104 (internal quotation marks omitted).

## III. DISCUSSION

In their motion to dismiss, defendants argue principally that plaintiffs released all of their claims through the Settlement Agreement between Opportunity and Citibank

described above.[4] Because the Court finds that plaintiffs did release their claims, there is no need to address defendants' additional arguments.

## A. Plaintiffs' Claims in this Action are Released "Claims" Pursuant to Section 2.1(b) of the Settlement Agreement.

Section 2.1(b) of the Settlement Agreement defines the scope of claims that the parties mutually released upon its execution on April 25, 2008, almost precisely a decade ago. That section released "any Cause of Action for any acts or omissions prior to the date of this Agreement, that arises from, is based on or relates to" several listed items. Settlement Agreement § 2.1(b).

These listed items include "the facts or circumstances set forth in the complaints, any amended complaints or counterclaims in the New York Litigation[.]" Settlement Agreement § 2.1(b)(xii). The Settlement Agreement defines "New York Litigation" to include *International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, No. 05 Civ. 2745 (S.D.N.Y.) – the litigation brought by Citibank against Opportunity in the Southern District of New York in March 2005, which the Settlement Agreement resolved. *Id.* § 1.2(bb); Compl. ¶ 100; Ex. D to Boccuzzi Decl. dated Apr. 26, 2017. Other listed items include, *inter alia,* "any of the Portfolio Companies," and "any of the Highlake Entities." Settlement Agreement § 2.1(b)(v)-(vi).

Thus, there are two basic requirements for a cause of action to constitute a released "Claim" pursuant to Section 2.1(b). First, the cause of action must be one that "arises from, is based on or relates to" at least one of the listed items. Second, the cause of action must be "for any acts or omissions prior to the date of this Agreement," which is April 25, 2008. Settlement Agreement at 1. The Court addresses each of these requirements in turn.

### 1. "Arises From, is Based On or Relates To"

All four of plaintiffs' claims meet Section 2.1(b)'s requirement that they "arise[] from, [are] based on or relate[] to" several of the listed items, including the "Highlake Entities," the "Portfolio Companies," and the "facts or circumstances set forth in" the counterclaims in the "New York Litigation."

---

[4] Not every party to this action was a party to the Settlement Agreement containing the relevant release. Compl. ¶ 268. However, plaintiffs in this action have essentially admitted that they are all bound by the release and that the release applies to all defendants in this action. *See* Arg. Tr. at 3:5-3:11, 4:2-4:24, Apr. 19, 2018 (counsel for plaintiffs confirming the Court's understanding that "if the release is effective . . . all of the defendants are released" and explaining that "[t]he Opportunity parties, which are in subclause two of 2.1(a), those are effectively plaintiffs"); Compl. ¶ 276 ("both the Signatory Plaintiffs and non-Signatory Plaintiffs released . . . claims").

### a.  Highlake Entities

Plaintiffs allege that when the Settlement Agreement was being negotiated, "Citibank was insisting that as part of any settlement, Opportunity would have to grant Citibank a substantial interest, worth tens of millions of dollars, in . . . proceeds which were related to various entities called Highlake (the 'Highlake Proceeds')." Compl. ¶ 189. As part of their duress causes of action, plaintiffs allege that "illegal threats were . . . the determinative motive for . . . the granting of a portion of the Highlake Proceeds . . . to Citibank[.]" Compl. ¶ 271; see also Compl. ¶ 281. Thus, plaintiffs' duress claims in this action relate to the Highlake entities – one of the items listed in Section 2.1(b).

### b.  Portfolio Companies

Moreover, the Settlement Agreement defines "Portfolio Companies" to include "Brasil Telecom S.A." and several other "Brasil Telecom" entities. See Settlement Agreement, Section 1.2(tt), Schedule G. The complaint in this action extensively discusses "Brasil Telecom," and refers to Brasil Telecom as a "portfolio company." Compl. ¶¶ 8, 11, 13. As described above, plaintiffs allege that the desire to merge Brasil Telecom with another company was a major reason why PT officials worked with Citibank to subject Dantas and Opportunity to duress. Moreover, the complaint alleges that Citibank was "working in concert with PT Party representatives . . . and their desginees at Brasil Telecom" to falsify the congressional report that Dantas alleges set his prosecution into motion and placed him under increased pressure. Compl. ¶ 14, 132-135. Thus, both Dantas's malicious prosecution claims and the plaintiffs' duress claims are related to Brasil Telecom, specifically listed as one of the Portfolio Companies, which in turn is one of the items listed in Section 2.1(b).

### c.  New York Litigation

Finally, the counterclaims that Opportunity brought in the New York Litigation and the complaint in this action contain numerous allegations in common. These include allegations that Citibank betrayed Opportunity and their joint venture; allegations regarding PT and its attempts to attack Opportunity and solicit illegal bribes from it; allegations that PT officials stated that they hated Dantas and Opportunity; and allegations that PT viewed Dantas as a threat and therefore made him the target of a manufactured criminal investigation. Compare Counterclaims, Ex. C to Declaration of Carmine D. Boccuzzi dated April 26, 2017 ¶¶ 163-165, 171-175, 191-196, with Compl. ¶¶ 9-13, 60-66, 72-75, 79-80, 84-86, 90, 93-97.[5]

---

[5] The Court may consider the counterclaims filed in the New York Litigation in deciding this motion to dismiss because the Court is permitted to take judicial notice of pleadings in other litigation related to

Although the allegations that are common to both the counterclaims in the New York Litigation and the claims in this complaint serve largely a contextual purpose in the current action, the language of the Settlement Agreement is broad, and does not require a claim to have an overly close connection with the listed items in order to be released. Rather, the release covers causes of action that are simply "relate[d]" to the "facts or circumstances set forth in" the New York Litigation counterclaims. Settlement Agreement § 2.1(b).

That standard is certainly met by the overlapping allegations here. Indeed, it is difficult to imagine a good faith reason why sophisticated parties such as plaintiffs would include in their complaint allegations that are wholly *unrelated* to their causes of action. Because of the significant number of overlapping allegations in the New York Litigation counterclaims and the complaint in this action, it is clear that the causes of action asserted here decidedly "relate[] to" the facts set forth in the counterclaims.

Thus, there are numerous connections between the causes of action plaintiffs have asserted before this Court and the items used to define the scope of released "Claims" in Section 2.1(b) of the Settlement Agreement. In particular, it is clear that the causes of action asserted here at an absolute minimum "relate[] to" the Highlake Entities, the Portfolio Companies, and "the facts and circumstances set forth in" the New York Litigation counterclaims.[6]

## 2. "For Any Acts or Omissions Prior to the Date of this Agreement"

In order for a claim to be released pursuant to Section 2.1(b), it not only must relate to at least one of the items listed in that section, but also must be "for any acts or omissions prior to the date of" the Settlement Agreement, which was April 25, 2008. Settlement Agreement at 1.

### a. Duress Claims

Plaintiffs' central allegation is that Citibank forced Dantas and Opportunity to agree to the Settlement Agreement, i.e., Dantas and Opportunity did so only under duress. As defendants point out, by definition the duress causes of action must be for acts prior to the date the Settlement Agreement was executed. Thus, the duress causes of action are "for . . .

---

this action. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773-74 (2d Cir. 1991); *Rothman v. Gregor,* 220 F.3d 81, 91-92 (2d Cir. 2000).

[6] In their briefing, defendants suggest that the current action may also relate to other items listed in Section 2.1(b) of the Settlement Agreement, including IEII and the Onshore Fund. Mem. Supp. Defs.' Mot. to Dismiss at 11-12. Because the connections described above are sufficient to conclude that the definition of released "Claims" in Section 2.1(b) of the Settlement Agreement covers plaintiffs' causes of action, the Court need not address these additional possible bases for the same conclusion.

8

acts. . . prior to the date of" the Agreement.

       *b.   Malicious Prosecution Claims*

    The timing of the malicious prosecution claims is not as clear cut. Those causes of action flow primarily from Citibank's act of altering a Brazilian congressional report to include false accusations against Dantas. *See* Pls.' Mem. Opp. Defs.' Mot. to Dismiss at 23-25. As Dantas alleges, it was this false report which "set in motion years of illegal persecution, which included the wrongful arrest of Mr. Dantas . . . followed by years of groundless prosecutions in the Brazilian courts." Compl. ¶14. The falsification took place in April 2006, two years before the Settlement Agreement was executed. Compl. ¶¶ 125-28. The complaint also alleges that the resulting expansion of the investigation against Dantas began before the Settlement Agreement was executed, with reports of Dantas's impending arrest coming out in March 2008 and on April 18, 2008, and with Brazilian federal prosecutors requesting access to Opportunity hard drives on the basis of the falsified congressional report as early as June 2006, almost two years before the Settlement Agreement was signed. Compl. ¶¶ 186, 187, 297.

    However, Dantas was not actually arrested by the Brazilian authorities until July 8, 2008 – two and a half months *after* the Settlement Agreement was executed. Compl. ¶ 212. Moreover, Dantas alleges that Citibank and its co-conspirators took action to ensure the continued success of his prosecution even after his arrest by providing new false claims of wrongdoing by Dantas to the Brazilian authorities. Compl. ¶¶ 226, 298.

    Although Dantas does make at least one allegation regarding Citibank's post-settlement conduct in support of his malicious prosecution claims, the key "act or omission" at issue is Citibank's falsification of the congressional report. Indeed, under the complaint's third claim for relief – the malicious prosecution claim – Dantas addresses six paragraphs covering two pages to describing defendants' falsification of the congressional report and the authorities' reliance on it, and only a single paragraph to false statements asserted after April 2008. *Compare* Compl. ¶¶ 292-97 *with* Compl. ¶ 298. And even these additional post-April 2008 false statements are specifically alleged to have been "consistent with the false statements in the" congressional report – suggesting that their effectiveness depended at least in part on the previous existence of the report. Compl. ¶ 298.

    Because defendants' acts or omissions relevant to the malicious prosecution claims took place primarily, indeed, almost exclusively, prior to the execution of the Settlement Agreement, the malicious prosecution claims are "for any acts or omissions prior" to the Agreement.

    Thus, every claim asserted in the complaint is a cause of action "for any acts or omissions prior to the date of [the Settlement Agreement], that arises from, is based on or relates to" the items listed in the Settlement Agreement. Therefore, all claims meet the

definition of a "Claim" that is being released as set forth in Section 2.1(b) of the Settlement Agreement.

## B. Plaintiffs' Duress Claims Are Not Excluded From the Release Because They Are Not "Arising Out Of" the Settlement Agreement Pursuant to Section 2.1(c).

Plaintiffs urge that even if their duress claims are covered by Section 2.1(b) of the Settlement Agreement, they have nonetheless not been released due to the Agreement's "Claims Not Included" clause in Section 2.1(c). That clause provides that: "Notwithstanding anything to the contrary herein, 'Claims' shall not include, and the releases set forth in Section 2.1(a) do not and shall not be interpreted to include, the release of any Cause of Action: . . . (ii) arising out of or for breach of this Agreement or any of the Transaction Documents." Plaintiffs argue that their duress claims are "arising out of" the Settlement Agreement and therefore cannot have been released.

This argument is not persuasive. Plaintiffs rely on easily distinguishable case law to reach their conclusion. In addition, fundamental principles of New York contract law conflict with their interpretation of Section 2.1(c).

### 1. The Cases Plaintiffs Rely on Are Readily Distinguishable

Plaintiffs rely on *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2d Cir. 1987) to argue that a claim that an agreement was obtained under duress arises out of that agreement.[7] However, *Genesco* is inapposite. In defining the scope of an arbitration clause covering "all claims and disputes of whatever nature arising under this contract," the Second Circuit panel in *Genesco* repeatedly emphasized throughout the opinion the strong federal policy in favor of arbitration. 815 F.2d at 854. Under that policy, courts are obligated to construe arbitration clauses "as broadly as possible," and are required to order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." 815 F.2d at 847 (internal quotation marks omitted).

Because the panel in *Genesco* relied so heavily on the policy favoring arbitration, which is not relevant here, and because it engaged in only a minimal analysis of the meaning of

---

[7] Plaintiffs also cite *Mar–Len of La., Inc. v. Parsons–Gilbane*, 773 F.2d 633 (5th Cir. 1985) in support of their interpretation of "arising out of." However, this case is even less relevant to the case at hand than *Genesco*. There, the Fifth Circuit decided that an arbitration clause covering "any dispute arising under this subcontract," but only "with respect to the interpretation or performance of this Subcontract" required the arbitration of a fraudulent inducement claim. 773 F.2d at 634. Not only did the court invoke "the heavy presumption of arbitrability," but its reasoning was also based on the notion that the clause covered "any dispute 'with respect to the interpretation or performance'" of the subcontract, *not* on the "arising under" language that would arguably be relevant here. 773 F.2d at 636-37.

the terms "arising under" or "arising out of," *Genesco* does not alter this Court's interpretation of Section 2.1(c).

### 2. *The Only Reasonable Interpretation of "Arising Out Of" is Narrow*

The Settlement Agreement provides that it is to be interpreted in accordance with New York law. Settlement Agreement § 7.10 ("this agreement shall be construed and interpreted in accordance with the law of the state of New York"). A basic tenet of New York contract law is that contracts should be interpreted such that no portion of the contract is rendered meaningless – or in other words, in such a manner that every provision in the contract has meaning. *See, e.g., Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007) ("A reading of the contract should not render any portion meaningless."). Furthermore, under New York law "[a] written contract will be read as a whole, and every part will be interpreted with reference to the whole[.]" *Matter of Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003).

Section 2.1(c)'s "Claims Not Included" clause is not the only scope-defining provision in the Settlement Agreement, nor is it the only provision where the definition of "arises" or "arising" is implicated. For instance, Section 2.1(b)'s definition of "Claims," discussed in detail above, defines a released "Claim" as a cause of action that "arises from, is based on or relates to" the listed items. Another scope-defining provision is the forum selection clause in Section 7.10, which states that the parties irrevocably submit to jurisdiction in New York for proceedings "arising out of or in connection with this agreement."

These provisions caution against interpreting the phrase "arising out of" so broadly that it becomes equivalent to "based on," "relates to," or "in connection with," because these terms are paired with "arises from" and "arising out of" in other scope-defining provisions of the Settlement Agreement. If "arising out of" is interpreted so broadly that it becomes synonymous with those terms, then they do not add anything to the contract, and thus are rendered meaningless.[8]

Plaintiffs' duress causes of action involve events that took place before the Settlement Agreement was executed, do not rely on any contested interpretation of the Settlement

---

[8] As plaintiffs pointed out at oral argument on this motion, the same principle also requires the phrase "arising out of" to be defined broadly enough so that it covers some claims other than simply claims "for breach of" the Settlement Agreement, given that Section 2.1(c) defines "Claims Not Included" as those "arising out of or for breach of" the agreement. Arg. Tr. at 13:14-13:17. However, there is no need to expand the meaning of "arising out of" as far as plaintiffs desire in order to achieve that distinction. A declaratory judgment action requesting that a Court interpret a provision of a contract, for instance, arises out of that contract but does not constitute an action "for breach of" that contract.

Agreement's terms, and make no claims regarding performance (or lack thereof) of the parties' obligations under the Settlement Agreement. To say that such claims "aris[e] out of" the Settlement Agreement is to expand the meaning of that term such that it essentially merges with "based on" or "in connection with," which would render those terms meaningless in the portions of the contract discussed above.

Thus, in the context of the entire Settlement Agreement, the only reasonable way to interpret the "arising out of" clause in Section 2.1(c) is such that it does not exclude plaintiffs' duress claims from the release.

### 3. *Prudential Considerations*

The Court finds that the language of Section 2.1(c), when considered in the context of the entire Settlement Agreement, unambiguously fails to carve plaintiffs' duress claims out of the release for the reasons stated above.  In addition, the Court notes that a contrary interpretation would raise significant prudential concerns.

As defendants suggest, permitting the reopening of a settlement agreement on the basis of a duress claim for damages almost a decade after its execution goes against the jurisprudential policy that favors settlement agreements and their enforcement. *See Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund*, 902 F.2d 185, 190 (2d Cir. 1990) (recognizing a "strong public policy favoring settlements" and noting that "[c]ourts are wary of disturbing settlements"); *see also Construction Technology, Inc. v. Cybermation, Inc.*, No. 91 Civ. 7474, 1996 WL 44430, at *1 (S.D.N.Y. Feb. 2, 1996).

Without releases, "the settlement of disputes would be rendered all but impossible," and therefore releases "may not be treated lightly." *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 563 (1969)).

The language of the Settlement Agreement's "Claims Not Included" clause, which preserves claims that are "arising out of or for breach of" the Agreement itself, is not at all unusual and makes perfect sense: at a minimum, the parties do not intend to release claims that arise in the future if one party breaches the terms of the Settlement Agreement after it has been entered into. A finding that such boilerplate language permits a party to reopen a settlement agreement to seek substantial additional damages many years later is illogical, counterproductive to the final resolution of litigation, and unsupported by precedent.

### C.  When the Malicious Prosecution Claims Accrued Is Irrelevant

Next, Dantas contends that because his malicious prosecution claims had not yet accrued when the Settlement Agreement was executed, they are not covered by the release. Dantas does not argue that there is any specific language in the Settlement Agreement that

limits the release to accrued claims, but rather asserts that in order for unaccrued claims to be covered by a release, there must be express language to that effect.

Dantas cites two cases for the proposition that a release does not cover unaccrued claims unless there is specific language to the contrary. In *Schneider v. Revici*, 817 F.2d 987 (2d Cir. 1987), the court stated that under New York law, a "covenant not to sue" – meaning an agreement not to bring future claims, as opposed to claims currently existing – must be "clear and unequivocal." 817 F.2d at 993. The Second Circuit decided that a patient's general agreement to "release [a doctor] from all liabilities" was too ambiguous to meet that standard. *Id.* Similarly, in *Benicorp Ins. Co. v. National Medical Health Card Systems, Inc.*, 447 F. Supp. 2d 329 (S.D.N.Y. 2006), a district court decided that an agreement releasing all claims the parties "have asserted or could, shall, or may have asserted" was not sufficiently "clear and unequivocal" to find that the parties intended "to relinquish claims that had not yet arisen as of the date of the release." 447 F. Supp. 2d at 339.

Here, the language used to define the scope of released claims is clear, unequivocal, and independent of the moment at which a claim accrues. The Settlement Agreement specifies clearly that the parties released claims that are "for any acts or omissions prior to the date of this Agreement[.]" Settlement Agreement § 2.1(b). The contract at issue in *Benicorp*, on the other hand, vaguely defined the scope of released claims based on when they may be asserted, 447 F. Supp. 2d at 339, and the contract at issue in *Schneider* failed to define the scope of released claims in any meaningful way, simply referring to "all liabilities." 817 F.2d at 993. By contrast, the release at issue here specifically defines the scope of released claims on the basis of when *the conduct* underlying those claims occurred – making the date at which the claims might be asserted or become capable of being asserted irrelevant.

Such a release does not run afoul of the need to define the scope of released claims clearly or the need to protect parties from unintentionally broad releases of future claims. Indeed, at least one court in this District has previously noted the reasonableness of interpreting a release such that it "encompasses any claims that the releasor may have been able to assert after executing the release based on conduct occurring beforehand." *Information Superhighway, Inc. v. Talk America, Inc.*, 274 F. Supp. 2d 466, 471 (S.D.N.Y. 2003). As that court recognized, releases that cover future claims only when they are based on past conduct – such as the release at issue here – avoid potential concerns about "conferring an indefinite prospective immunity on the releasee that may not have been intended by the parties." *Information Superhighway*, 274 F. Supp. 2d at 471.

The Settlement Agreement in this action contains clear language defining the scope of released claims on the basis of the time at which the underlying conduct occurred. As discussed above, the malicious prosecution claims are based almost exclusively on

13

defendants' conduct that occurred *before* the Settlement Agreement was executed. Therefore, the fact that those claims did not accrue until afterward is irrelevant, and the release covers the malicious prosecution claims.

## D. The Alleged Duress Does Not Impact the Validity of the Release Because Plaintiffs Have Ratified the Settlement Agreement

Finally, plaintiffs contend that even if all of their claims are covered by the language of the release, the release should not be enforced because it was obtained via duress, meaning it was not "voluntarily entered into" as New York law requires. *Loccenitt v. Pantea*, No. 12 Civ. 1356, 2014 WL 7474232, at *2 (S.D.N.Y. Dec. 29, 2014) (quoting *Pampilonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998)). It is true that under New York law, a release may "be attacked for being the product of fraud, duress or undue influence[.]" *Skluth v. United Merchants & Mfrs., Inc.*, 163 A.D.2d 104, 106 (1st Dep't 1990). However, a release – like any other contractual agreement – cannot be challenged on the basis of duress by a party that has ratified it by accepting its benefits and failing to promptly repudiate it. *Allen v. Riese Org., Inc.*, 106 A.D.3d 514, 517-18 (1st Dep't 2013) (collecting cases where New York courts applied the ratification doctrine to contracts involving releases).[9] That is the case here.

### 1. The Doctrine of Ratification Applies to This Case

Plaintiffs contend that these rules do not apply to them because they do not seek to invalidate or rescind the Settlement Agreement, but rather allege duress solely as a claim for damages. They urge that under both New York and Brazilian law, repudiating or annulling an agreement obtained under duress is not required in order to seek damages only. *See Turkish v. Kasenetz*, 832 F. Supp. 565, 570 (E.D.N.Y. 1993), rev'd on other grounds, 27 F.3d 23 (2d Cir. 1994),

---

[9] Because the Settlement Agreement is construed in accordance with New York law, Settlement Agreement § 7.10, the Court relies on New York law in deciding whether the relevant release provision should be set aside due to plaintiffs' duress claims (which were brought under Brazilian law and, in the alternative, New York law). Even assuming the potential applicability of Brazilian law to this question, the outcome would not change. Although the parties' declarations regarding Brazilian law disagree as to whether Brazilian law permits plaintiffs to seek compensation without first formally annulling the Settlement Agreement, neither party's declaration claims that under Brazilian law plaintiffs may set aside the release clause without also annulling the entire Settlement Agreement. Indeed, a declaration provided by defendants explains that under Brazilian law, settlement agreements are considered indivisible. *See* Reply Declaration of Cristiano de Sousa Zanetti Supp. Defs.' Mot. to Dismiss ¶¶ 11-13, 18 ("Under Brazilian law, plaintiffs may not simply select certain provisions of the agreement that they find favorable to maintain in full force and effect, but then seek to disavow the effect of other[] provisions they find less favorable . . .").

*Infectious Disease Sols., P.C. v. Synamed, LLC*, No. 07 Civ. 5423, 2012 WL 1106847, at *9 (E.D.N.Y. Mar. 30, 2012) ("duress is a species of fraud").

Even assuming that plaintiffs are correct in their theory that repudiation is not required to prevail in a duress action for damages only, that does not help them here. By seeking to avoid the release provisions of the Settlement Agreement, plaintiffs are no longer merely asserting duress as an action for damages, but rather are invoking duress as one of several "recognized bases for setting aside written agreements." *Nelson v. Lattner Enterprises of New York*, 108 A.D.3d 970, 972 (3d Dep't 2013). By urging that the release is invalid due to duress, plaintiffs do in fact seek to rescind at least a portion of the Settlement Agreement on the basis of duress – and in order to do so, they must not have ratified the agreement. *See VKK Corp. v. National Football League*, 244 F.3d 114, 123 (2d Cir. 2001).

### 2. *Plaintiffs Have Ratified the Settlement Agreement*

Plaintiffs themselves essentially concede that they have ratified the agreement by arguing that they have chosen the option of "ratification and suit for damages" under *Turkish v. Kasenetz*, 832 F. Supp. 565 (E.D.N.Y. 1993). Pls.' Mem. Opp. Defs.' Mot. to Dismiss at 23.

Moreover, plaintiffs have received benefits for the past decade through the Settlement Agreement – most notably in the form of the end of the New York Litigation that Citibank filed in this District in 2005, and Citibank's release of those and other claims it had against the plaintiffs. Settlement Agreement §§ 2.1, 2.4. Plaintiffs continue to intentionally and willingly accept these benefits – after all, they repeatedly assert that they do not seek to rescind the Settlement Agreement – and therefore are deemed to have ratified the agreement. *See United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011). As the New York courts have made clear, "a plaintiff cannot claim that he or she was compelled to execute an agreement under duress while simultaneously accepting the benefits of the agreement." *Allen*, 106 A.D.3d at 517.

### 3. *Allegations That the Duress Abated Only Recently Cannot Save Plaintiffs' Claims*

Last, plaintiffs urge that they need not have repudiated the Settlement Agreement because the duress which caused them to agree to it in the first place abated only recently and under New York law, the obligation to promptly repudiate a contract in order to preserve a duress challenge does not begin until after that duress ends. *See Mathias v. Jacobs*, 167 F. Supp. 2d 606, 616 (S.D.N.Y. 2001).

However, plaintiffs allege that the duress in this case began to recede as early as September 2015, when a Brazilian Minister of the Supreme Court publicly wrote about severe corruption within the PT-controlled government. Compl. ¶ 259. Indeed, the complaint refers to revelations of corruption "over the past year" that caused the duress to abate. Compl. ¶ 260.

15

Furthermore, the allegedly manufactured criminal actions against Dantas are alleged to have been finally resolved in his favor, with no possibility of further appeal, in May and August 2016. Compl. ¶¶ 262, 264. Even the most conservative estimate of the time between when the duress abated and when plaintiffs brought this action in February 2017 would amount to several months at an absolute minimum. Delays of similar length have been found sufficient to deem an agreement ratified under New York law. *See VKK Corp.*, 244 F.3d at 123 ("Delays as short as six months have been held to constitute forfeiture of the claim.").

More importantly, plaintiffs have repeatedly made clear throughout this litigation that even by bringing this action, they do not seek to repudiate the Settlement Agreement. *See* Pls.' Mem. Opp. Defs.' Mot. to Dismiss at 12-13, 23; Arg. Tr. 16:1-16:12. Rather, they seek to preserve all of its provisions *except* their half of the mutual release. Because plaintiffs continue to accept the benefits of the Settlement Agreement even now, it is clear that they have ratified that agreement and cannot now seek for a portion of it to be set aside as involuntary.

Because the language of the Settlement Agreement's release covers all of plaintiffs' claims, and because by ratifying the Settlement Agreement they have lost the ability to set aside the release, plaintiffs' claims must be dismissed.

### E.  Amendment of the Complaint Would Be Futile

Several months after defendants filed their motion to dismiss, plaintiffs moved for leave to amend their complaint pursuant to Fed. R. Civ. P. 15(a)(2).

Rule 15 requires that courts "should freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave to amend "may properly be denied" for reasons such as "undue delay, bad faith . . . [and] futility of amendment[.]" *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Amendment is considered futile "if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Plaintiffs state that they seek to amend the complaint in order to add new factual allegations to their 100-page, 312-paragraph complaint that have come to light during "ongoing scrutiny of the political, legal, and business culture in Brazil during the time period relevant to this case[.]" Mem. Supp. Pls.' Mot. for Leave to Amend at 7. The proposed new allegations include "[n]ew evidence of bribery and other wrongdoing involving Citibank's Brazilian lawyers," as well as "[n]ew evidence of retaliation as a tool to silence perceived threats to the Brazilian state." *Id.* at 8-9. Plaintiffs also propose new allegations "regarding intimidation as a tool to control the Brazilian judiciary" and new evidence of corruption within PT. *Id.* at 10-12. However, plaintiffs themselves admit that "[n]one of the new allegations in the proposed

16

Amended Complaint alter [their] legal theories or add new parties; they only add further factual detail." *Id.* at 12.

These additional factual allegations do nothing to change the fact that all of plaintiffs' claims have been released pursuant to the Settlement Agreement. Therefore, the proposed amended complaint would be dismissed for the same reasons that the Court is now dismissing the original complaint. Because amendment would be futile, plaintiffs' motion for leave to amend is denied.

## IV. CONCLUSION

Because all of plaintiffs' claims have been released, defendants' motion to dismiss the complaint is granted. Because amendment would be futile, plaintiffs' motion for leave to amend the complaint is denied.

Dated:  New York, New York

June 18, 2018

SO ORDERED:

Sidney H. Stein, U.S.D.J.

17